

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00099-CR
_____

LIDIO BARRIOS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 39191-B

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

O P I N I O N

An evening in January 2010 proved, again, that gang affiliation, alcohol, and firearms can be a deadly combination. That evening, Lidio Barrios shot and killed Jorge Rivera, reportedly in the process of trying to defend Barrios' cousin Juan from Rivera's attack. Barrios appeals from his resulting murder conviction and his sentence of thirty years' imprisonment. We affirm the trial court's judgment, contrary to Barrios' assertions on appeal, because we hold that (1) Barrios was not entitled to a jury submission on self-defense, (2) failure to submit a jury issue on defense of a third person was harmless error, and (3) Barrios was not entitled to jury issues on the lesser-included offenses.

According to Officer Lannie Smith, Jr., members of the Barrios family are affiliated with the Puro Carnales (PC) gang. Their rivals are members of the Corona family, who are known to have gang affiliations with Sur 13, also known as the Sur Treces gang. Both gangs wear blue to signify membership. As explained by known PC gang member Juan Barrios,[1] he has issues with the Coronas, and they have issues with him. These issues would lead to arguments, throwing of projectiles, and display of gang signs.[2]

On the day of the incident, Juan had driven his navy blue Lincoln, carrying his father, Leonardo, and friend, Frank Arias, to his uncle Roberto's home to cook out, drink, and shoot

---

[1]Smith testified Juan admitted gang affiliation in an interview in front of his father, Leonardo. Leonardo testified Smith "pushes and pushes and pushes [Juan] to tell him that he's in PC." At trial, Juan denied PC membership, although Smith testified that graffiti on the Barrios property, Juan's possession of blue bandanas, and a five-point star sticker on his car signified PC gang membership. Juan later admitted that he associates with PC gang members.

[2]While Rivera and Barrios' family members had gang affiliations, Smith could not confirm whether Rivera or Barrios were members of a gang.

2

weapons that included a Model 88 twelve-gauge shotgun manufactured by Maverick Firearms. On their return trip home, Juan drove the car, Leonardo sat behind him, Arias sat in the front passenger seat, and Barrios sat behind Arias. The unloaded shotgun was located on the floorboard in the back, along with a box of unused shotgun shells manufactured by Winchester in East Alton, Illinois. They detoured to pick up more beer and found themselves on the street where known Sur Treces gang member Antonio Corona lived.[3]

Reportedly, Juan was unaware that Hector Corona and his brother, Juan Martin Corona Flores,[4] had been called into action earlier that day by their cousin, Rivera, who claimed that the Barrioses hurt him and "threw something [at] the car" Rivera was driving. The trio climbed into Rivera's red Lincoln and drove to the Barrios home. Because no one answered the door, Hector, Martin, and Rivera had decided to return to Hector's apartment when they "ran into [the Barrioses] head-on" by Antonio's home. The red Lincoln pulled in front of Juan's blue Lincoln in the middle of the road, blocking the Barrioses' path. Martin testified, "[W]e stopped, they stopped."

The encounter began when Rivera exited his car holding a twenty-four-inch long metal breaker bar to talk to the Barrioses, with Martin and Hector in tow. There was testimony, including Martin's, that the breaker bar was capable of being used as a deadly weapon. Martin explained that, "in that moment, we're -- we're angry." Arias testified he was scared, and

---

[3]Antonio testified that Juan's vehicle drove down his street three or four times, implying that the Barrioses were looking for trouble.

[4]For the sake of clarity, we refer to Juan Martin Corona Flores as Martin. In this opinion, the name Juan refers to Juan Barrios.

Barrios said, "[A]t that moment I spooked, I -- because I didn't know what was happening." Rivera went to the driver's side of the Barrios car towards Juan; Hector walked to the rear, driver's side passenger window where Leonardo sat; and Martin placed himself outside of the front passenger window close to Arias. The positioning of each person involved in the incident is indicated below:



Leonardo stepped out of the car to talk to Rivera and Hector in an attempt to calm them down.[5] Leonardo testified that Rivera was angry, was holding the breaker bar up with both hands "[l]ike he was going to hit the car," and said "that we had thrown some bottles at his car." Leonardo did not know if the upset Rivera "wanted to hit my son Juan or my car." He told Leonardo that he could "go ahead and break the window in our car if you want." Rivera was attempting to open Juan's door, but was unsuccessful.

During this time, Martin said he asked Arias "[w]hy they were hurting my cousin," while Arias testified Martin "came and said what was my problem," while looking angry. Arias believed "[b]ecause [Martin] came to my side, . . . I thought he was going to do something to

---

[5]Martin testified that Juan, Arias, and Leonardo exited their vehicle while Barrios remained inside.

me." He claimed, "[I]n his tone he was trying to . . . I guess he was trying to fight me or something." Martin "put his hand in the car and unlocked the doors" and opened Arias' door.

> Barrios took the stand and testified:

> I only saw when [Rivera] wanted to open Juan's door, but he wasn't able to open it. And that's when Leonardo asked him why he was so angry. And he said that something has been thrown to him. And Leonardo said, "If you're sure that we have thrown something," for him to break a window. He said no, that he wanted Juan.[6] And in that, he opened the door. He wanted to get him out. And when I saw he was wanting to get him out, I remembered that I had the -- the weapon. I picked it up from bottom. It was empty, so I -- I slid it.

Barrios believed that Rivera, Hector, and Martin would run when they saw him loading the weapon. But when the car doors were unlocked by Martin, Rivera opened Juan's driver's side door all the way and stood in between Juan and the door. Barrios testified Rivera called out to Martin to bring Rivera's weapon.

Then Barrios, who testified he had consumed twelve to fourteen beers, decided to react.[7] He placed "four or maybe three" shells into the gun and told Rivera "to leave, that we didn't want any problem. And he -- he said no, that he had a problem from the past Friday."[8] Juan testified he leaned into Arias' seat because Rivera lifted the metal breaker bar as if to hit him. Leonardo stated it "seems like he threw it," and Barrios also believed Rivera was going to hit

---

[6]Martin and Barrios testified that Juan gave the order for Barrios to retrieve the shotgun.

[7]Juan testified Barrios had been continuously drinking that day.

[8]Frank testified Barrios did not say anything during the shooting.

Juan with the bar.[9]  Barrios stated, Rivera "bends down, looking at Juan . . . . It—and the same time he wants to hit Juan, he looked over to see me.  And that's when I pulled it."  Rivera was shot in the face.  Barrios testified that he was aiming to hit Rivera in the hand, but missed when Rivera bent down.[10]

Martin, Juan, and Leonardo all testified that there was no reason for Barrios to shoot Rivera.  Barrios told the jury that he did not know Rivera, had no intent to kill him, and was sorry that he had died.  Barrios explained that he was only trying to protect Juan.

After the first shot, Juan bolted from the driver's seat, stepped over the fallen Rivera, and ran.  Frank exited the passenger seat and ran.  Barrios yelled to Leonardo to grab the gun so he would not "do anything else."  Leonardo testified, "One time I got the weapon, but I wasn't able to take it away from him," so he ran from the scene as well.  This prompted a scuffle for the weapon.  Barrios testified he shot another round into the air after Hector tackled him inside of the car.  Neighbors, including Antonio, approached from their houses to investigate.

A baseball bat was also in the backseat of Juan's vehicle.  Barrios said Martin and Hector forced him out of the car and beat him with the baseball bat.  Martin explained, "[W]e were trying to take the pistol away from him, and he was still shooting at my brother here like to the back; and he was still shooting people."  Antonio testified, "I saw people running, and I got close.  That's when I saw my cousin grabbing the weapon from him.  And my other cousin was

---

[9]Martin stated, "We were speaking with them, with all of them.  Then with -- all of a sudden, without a motive, [Barrios] shot."  However, when asked whether Rivera swung the breaker bar at anyone, Martin replied, "No one resulted hurt with that."

[10]While Martin and Juan testified that Rivera was standing up when he was shot, the physical evidence suggests that Rivera was bent down.

6

trying to take the -- the pistol." After the shotgun was retrieved, Antonio, Hector, and Juan detained Barrios while police were called.

Officer Brandon Thornton responded to the 9-1-1 call. He "noticed a Hispanic male was lying on the ground . . . at the driver's door, . . . and he looked like he had a gunshot wound to his head or to his facial area." Officer Christopher Sheain observed that Rivera was lying next to a metal breaker bar and that no part of his body was in the car. The breaker bar was underneath "the front left door of the driver's door."

Thornton heard a "disturbance" and saw "several people holding down another Hispanic male. All I remember hearing was, 'He's the shooter. He's the shooter. He shot the other guy.'" Officer James Bettis testified, "Antonio Corona came up to me, holding the shotgun, and advised that this was the weapon that was used, and I took possession of it." Detective Jimmy Redmon retrieved the baseball bat which was "laying out in the front yard" of Antonio's neighbor's home. Specks of blood were located around the bushes. Officers noticed that Barrios, when taken into custody, was bleeding from wounds suffered to his head. Detective Chris Taylor testified that Barrios had "some small abrasions to his leg, shoulder, back and head. The laceration on the back of his head was shedding blood," and he had bruises all over his body.

Barrios was transported to the emergency room. He told nurse Hector Hernandez "he had been beaten by -- with a baseball bat; he couldn't tell me who did it." Barrios had "a lot of bruising and lacerations to his head[,] . . . [a]nd he did complain of a major headache and also some flank pain, the right side. And I think -- his right leg, he was complaining." Staples were used to repair the laceration on Barrios' head. Hernandez testified that Barrios "did definitely

7

smell of alcohol." Barrios told Hernandez that he had consumed "24 beers to drink that day," although he claimed at trial that he consumed only twelve to fourteen beers. Officer Eric Hewitt opined that Barrios was intoxicated to the degree that he could not stand without assistance, but testified that his condition could also have been caused by the beating he endured and pain medication administered at the hospital.

According to Redmon's investigation, "it appeared the victim was standing in the 'V' of the open front and rear door on the left side of the vehicle with his head lower than the level of the top of the vehicle when he was shot." Redmon concluded that Rivera must have been bent over due to his height. Rivera was wearing the number "13" on his belt buckle, signifying affiliation with Sur 13 or Sur Treces.

On appeal, Barrios argues that—given his claim that he shot Rivera because Rivera was threatening to hit Barrios' cousin Juan with a breaker bar—the trial court erred when it found that he was not entitled to jury charges on self-defense and defense of a third person. Apparently, that ruling was made because Barrios was an illegal immigrant in possession of a firearm and ammunition that affected interstate commerce, an asserted violation of federal law. *See* 18 U.S.C.A. § 922(g)(5) (2005). Barrios also argues that the jury charge should have contained the lesser-included offenses of aggravated assault and deadly conduct. We affirm the trial court's judgment because we hold that (1) Barrios was not entitled to a jury issue on self-defense, (2) failure to submit the issue of defense of third person was harmless error, and (3) Barrios was not entitled to submission of the lesser-included offenses.

Based on Rivera's apparent gang membership, his initiation of the confrontation, possession of the breaker bar, testimony of his demeanor, and physical evidence suggesting he was bent over the open driver's side of Juan's car, the defense employed a strategy of self-defense and defense of a third person. Section 9.32 of the Texas Penal Code addresses the use of deadly force in self-defense:

> The actor's belief . . . that the deadly force was immediately necessary . . . is presumed to be reasonable [only] if the actor: . . . was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PENAL CODE ANN. § 9.32(b)(3) (West 2011). The United States Code contains the following provision:

> It shall be unlawful for any person . . . (5) who, being an alien -- (A) is illegally or unlawfully in the United States; . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C.A. § 922(g)(5).

Outside the presence of the jury, the State sought a motion in limine related to presentation of evidence that Barrios acted in self-defense based on 18 U.S.C.A. § 922(g)(5). The State reasoned that, because Barrios was an illegal immigrant[11] in possession of a firearm, he was no longer entitled to assert self-defense. Defense counsel argued that the State's suggestion that self-defense was not available was a violation of the Constitution because "under

---

[11]The defense stipulated that Barrios was in the country illegally.

9

no circumstances can an illegal alien have the right of self-defense if the illegal alien happens to grab for or possess" a firearm. The trial court ruled:

> At this time I'm going to grant the motion in limine and prevent -- preclude any testimony or statements concerning self-defense at this time unless there is something brought before the Court's attention that would change that. But again, you have to approach the Bench before trying to go into that. Because I think, under the current state of the law, even though I understand that a Texas court has not actually addressed that issue, looking at the facts of this case, and the Barron case -- or the "Ba-rone"[12] case, I think is how it would be pronounced, and the intent of the legislature, I don't think it was their intent to allow that loophole for an illegal alien who -- to possess a firearm; therefore, I'm going to grant the State's motion in limine at this time.

To establish that Barrios was possessing "in or affecting commerce" a firearm or ammunition, or had received "any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," the State called forensic scientist Stacey Phetteplace to testify.[13] Phetteplace identified the firearm as a Maverick Model 88 that contained the engraving "Maverick by Mossberg." She stated, "Maverick Arms was started in 1988, in Eagle Pass, Texas. It's named after the county, Maverick County, which is where Eagle Pass is. They have -- they also established a firearm -- a parts factory." Petteplace added that "Mossberg Firearms is based in New Haven, Connecticut" and she had taken a personal tour of the Connecticut factory. Based on her "personal tour of the Mossberg factory and . . . the Mossberg history book," she testified that, while the gun was made in the United States, "the parts are made in Mexico, at one

---

[12]The court was referring to *Barron v. State*, No. 05-08-00637-CR, 2010 WL 1294078 (Tex. App.—Dallas Apr. 6, 2010, pet. ref'd) (mem. op., not designated for publication). That case declined to "consider whether the [trial court] improperly considered appellant's illegal immigrant status" because he was not entitled to a self-defense instruction since the evidence established "as a matter of law that appellant sought an explanation or discussion with [the victim] about their differences while illegally carrying a handgun," a violation of Section 9.31(b)(5)(A). *Id.* at *3.

[13]Juan testified Barrios wanted to purchase the weapon from Leonardo, while Leonardo and Barrios denied the same.

particular factory, and all of the parts are shipped to the Maverick factory in Eagle Pass." She conditioned her statement by testifying that she could not provide personal knowledge where the specific weapon used by Barrios was manufactured, but could testify generally that all Mossberg "parts are made from a single factory in Mexico." Detective Redmon testified that the shotgun shells were manufactured by Winchester, and the stamp on the shells read "East Alton, Illinois."

After the evidence was presented, defense counsel objected to the charge by espousing belief that "the Charge should charge on self-defense; and . . . defense of a third person, 9.33; and 9.32, deadly force in defense of a third person." Counsel also "object[ed] to the Charge because it does not include the lesser-included offense of aggravated assault and the offense of deadly conduct." The court overruled these objections, reasoning:

> Under the issue of self-defense, the Court finds, under section 9.32(b)(3), that the defendant, as it has been stipulated and agreed by the parties, at the time of this offense was not—was in this country illegally; therefore, under United States Code Section 992—or 18 U.S.—United States Code 922 Subsection (5), he was not allowed to possess a weapon, a firearm or ammunition that was in interstate commerce or that affected interstate—or that affected commerce.
>
> There has been testimony on the record from—from an expert, and then also from an officer who has knowledge, that the firearm, while that it was manufactured in the United States—I mean, in the state of Texas, the parts that went into that came from Mexico. That affects foreign commerce.
>
> In addition, the ammunition used, the defendant admitted he was in possession not only of that firearm, but also ammunition which is Winchester brand, which is manufactured in the state of Illinois. Therefore, both of those affect commerce and interstate commerce; therefore, he was in violation of 18, 922 Subsection (5) of the United States Code. That is a felony offense, because it is punishable by up to 120 months in federal prison; therefore, that is greater than a Class C misdemeanor; therefore, under Section 9.32 of the Penal Code, he is not entitled to a charge on self-defense.

11

On appeal, Barrios complains that the failure to include self-defense, defense of a third person, aggravated assault, and deadly conduct resulted in jury charge error. He does not contest the finding that the federal statute was violated.

Our review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Initially, we determine whether an error occurred, and then "determine whether sufficient harm resulted from the error to require reversal." *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *reaffirmed by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence. . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). "A trial court's decision to deny a defensive issue in a jury charge is reviewed for an abuse of discretion." *Gaspar v. State*, 327 S.W.3d 349, 355 (Tex. App.—Texarkana 2010, no pet.) (citing *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000)). When reviewing a trial court's decision to deny a requested defensive instruction, "we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

12

We also review the trial court's decision regarding a lesser-included offense charge under an abuse-of-discretion standard. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004); *Dobbins v. State*, 228 S.W.3d 761, 768 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd). An abuse of discretion occurs when a trial court acts arbitrarily, unreasonably, or without reference to any guiding rules and principles. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)).

*(1)    Barrios Was Not Entitled to a Jury Submission on Self-Defense*

Barrios argues that the court erred in failing to submit self-defense and defense of third person instructions because:

> Penal Code § 9.31(a)(3) provides that use of force is presumed to be reasonable if the actor was not otherwise engaged in "criminal activity.". . . . The trial court erroneously found that a federal law forbidding illegal aliens to possess firearms in interstate commerce provided the necessary criminal activity to provide the disqualification provided in Penal Code 9 [sic]. . . . Given the multiplicity of federal crimes, it is inconceivable to think that the Texas Legislature intended the right of self-defense, so dear to the heart of Texans, would depend on the legislative whims of the federal government.

No authority is cited to support this argument. The argument also reveals what appears to us to be a general misunderstanding of the parties at trial concerning the effect of Section 9.31(a)(3) when other criminal activity is involved. When the accused is engaged in other criminal activity, the statute does not disqualify the accused from defending his or her use of force, it simply removes the presumption that his or her use of force was reasonable—a significant difference. Our conclusions on these defensive matters—that Barrios was not entitled to an issue on self-defense, but should have received one on defense of a third party—are controlled, not by Section

13

9.31(a)(3), but by what the evidence raised. But, to get there, we will start with our discussion of Section 9.31(a)(3).

Criminal activity as it is used in Chapter 9 of the Texas Penal Code is undefined. Therefore, we give effect to the plain meaning of statutory language as "the best indicator of legislative intent." *Shipp v. State*, 331 S.W.3d 433, 437 (Tex. Crim. App. 2011). Section 1.05 of the Texas Penal Code states, "The rule that a penal statute is to be strictly construed does not apply to this code. The provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code." TEX. PENAL CODE ANN. § 1.05 (West 2011). Thus, criminal activity can be broadly construed to comport with the generally understood concept that it would encompass any activity that constitutes a crime. Section 1.03 states that "[c]onduct does not constitute an offense unless it is defined as an offense by statute, . . . or rule authorized by and lawfully adopted under a statute." TEX. PENAL CODE ANN. § 1.03 (West 2011). Because 18 U.S.C.A. § 922 is a statute which defines criminal offenses, and there is no argument that it was not authorized or unlawfully adopted, we find that criminal activity as used in Section 9.31 includes activity that would constitute a crime under 18 U.S.C.A. § 922(g)(5).

The Texas Penal Code requires that a presumption that favors the defendant be submitted to the jury "if there is sufficient evidence of the facts that give rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact." *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). Barrios' use of deadly force would be presumed reasonable if he "was not otherwise engaged in

14

criminal activity, other than a Class C misdemeanor that is a violation of the law or ordinance regulating traffic at the time the force was used." TEX. PENAL CODE ANN. § 9.32(b)(3). Here, the trial court was satisfied that the presumption was precluded due to Barrios' status as an illegal immigrant who was in possession of a firearm or ammunition, which the court believed violated 18 U.S.C.A. § 922(g)(5).

This finding merely removed the need to instruct the jury that Barrios' belief that force was immediately necessary was reasonable, but it did not obviate the need to submit to the jury the question of whether Barrios' belief was reasonable. In other words, commission of a crime under Section 9.31(a)(3) removes the presumption of reasonableness, whereas commission of acts under Section 9.31(b) renders the use of force against another unjustified. TEX. PENAL CODE ANN. § 9.31 (West 2011).

A "reasonable belief" is one held by an ordinary and prudent person in the same circumstance as the actor. TEX. PENAL CODE ANN. § 1.07(42) (West Supp. 2012). Whether a defendant was prompted to act by a reasonable belief is ordinarily an issue for the trier of fact. *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.). Therefore, we next examine whether the trial court was required to submit the issues of self-defense and defense of third person to the jury. *See Morales*, 357 S.W.3d at 7–8.

"A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gaspar*, 327 S.W.3d at 356 (citing *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Guilbeau v. State*, 193

15

S.W.3d 156, 159 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)); *see Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). There must be some evidence, when viewed in the light most favorable to the defendant, that will support the claim. *Id.* (citing *Ferrel*, 55 S.W.3d at 591; *Hill v. State*, 99 S.W.3d 248, 251 (Tex. App.—Fort Worth 2003, pet. ref'd)). "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Id.* (quoting *Shaw v. State*, 243 S.W.3d 647, 657 (Tex. Crim. App. 2007)). However, "if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue." *Id.* (quoting *Ferrel*, 55 S.W.3d at 591).

Under Section 9.32, Barrios would be justified in using deadly force against Rivera: (1) if he would be justified in using force against Rivera under Section 9.31; and (2) when and to the degree Barrios reasonably believed the deadly force was immediately necessary to protect himself from Rivera's use of unlawful deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a)(1), (2).

The State contends that there was no evidence showing that Barrios feared for his own safety. It is correct.[14] Although Barrios testified that he was "spooked" when he saw the red Lincoln, because he did not know what was happening, he did not testify that he feared for his

---

[14]The State also argued that Barrios was not entitled to a defensive instruction because he did not testify that he intended to kill Rivera. However, as explained below, Barrios testified he intended to shoot Rivera in the hand, meeting the requirements of murder as charged under paragraph two of the indictment, which tracked Section 19.02(b)(2)'s language specifying that a person commits murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

own safety at the time the weapon was discharged. Instead, he testified that he shot the weapon to protect Juan. We conclude that Barrios was not entitled to a jury submission on self-defense. This point of error is overruled.

*(2)    Failure to Submit a Jury Issue on Defense of a Third Person Was Harmless Error*

Barrios was justified in using deadly force against Rivera to protect Juan if, under the circumstances as he reasonably believed them to be, Barrios reasonably believed that intervention in the form of deadly force was immediately necessary to protect Juan against Rivera's use or attempted use of unlawful deadly force.[15] *See* TEX. PENAL CODE ANN. §§ 9.31–.33 (West 2011).

Here, the jury heard evidence that the Coronas and the Barrioses were affiliated with rival gangs. A car driven by the Coronas blocked the car driven by Juan. An angry Rivera, wearing a belt buckle signifying gang affiliation, exited his vehicle with cousins Hector and Martin. They surrounded the Barrios car and exchanged words. Rivera attempted to open Juan's driver's side door while brandishing a twenty-four-inch metal breaker bar. He was eventually successful in this endeavor, prompting Barrios to engage the gun. There is testimony in the record suggesting that Rivera bent down below the hood of the car and swung the breaker bar at Juan, inducing Barrios to shoot. Rivera's body was found beside the breaker bar, and forensic evidence suggests that he had bent down close to the driver at the time of the shooting.

---

[15]"[T]he focus of the defense-of-third persons defense is upon what the actor reasonably believes concerning the situation of the third person." *Morales*, 357 S.W.3d at 8. However, a reasonable belief in defense of third person cases is a belief that an ordinary and prudent person would have held in the same circumstances as the defendant. TEX. PENAL CODE ANN. § 1.07(42); Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges-Defenses* PJC B17.3 (2010).

17

When viewed in the light most favorable to Barrios, we find that the evidence raised the issue of whether Barrios reasonably believed deadly force was immediately necessary to protect Juan from Rivera's use or attempted use of unlawful deadly force. Therefore, we find that the trial court was required to submit the issue of defense of third person to the jury. Failure to do so was error.

The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. Here, because proper objections were made at trial,[16] reversal is required if the error is "calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 36.19

---

[16]The State argues that error was not preserved because "[t]he defense did not provide the language for [the self-defense] instruction, either in writing or by dictating to the court reporter as required by" Article 36.15 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 36.15 (West 2006). A general objection that the charge fails to charge the jury on the issue of self-defense does not preserve error absent a written instruction or dictation as to the instruction sought. This is because a self-defense instruction could refer to instruction under Section 9.31, 9.32, or 9.33, all of which have several options or theories available which could be submitted to the jury. Texas courts have held that, absent a written instruction or dictation, a general request does not specify the particular instruction desired because a trial court may be left wondering what sections or subsections to apply. *Bennett v. State*, 235 S.W.3d 241, 243 (Tex. Crim. App. 2007) (objection on failure to submit self-defense "as it applies to this case" was insufficient to preserve the issue of submission of defense of third person even where evidence raised defense of third person) (citing *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998)); *Hutcheson v. State*, 899 S.W.2d 39, 41–42 (Tex. App.—Amarillo 1995, pet. ref'd); *Reece v. State*, 683 S.W.2d 873, 874–75 (Tex. App.—Houston [14th Dist.] 1984, no pet.).

Barrios' objection was not a general objection, and this is not a situation involving an objection to the absence of an instruction; rather, it was a request that a specific type of instruction be given. Although it would be clearer if a specific proposed instruction was either read into the record or provided to the court in writing, we look to the "record for statement by the trial court that reflect what its understanding was, the general theme of defense evidence, the various defensive theories presented at the trial, and anything else that may shed light on whether the trial court understood the objection." *Jackson v. State*, 288 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *see Rogers v. State*, 105 S.W.3d 630, 640 (Tex. Crim. App. 2003). Here, counsel stated that "the Charge should charge on self-defense; and . . . defense of a third person, 9.33; and 9.32, deadly force in defense of a third person." In considering the record as a whole, we find that counsel preserved his points of error for our review and that the trial court understood the objections as requesting instructions under Sections 9.31(a), 9.32(a), and 9.33. *See Gaspar*, 327 S.W.3d at 355 (objection followed by discussion demonstrates that trial court understood request for self-defense instruction preserved error relating to jury charge despite failure to present proposed charge in writing or dictate it into record).

18

(West 2006). In other words, on appeal, Barrios needs to demonstrate only "some harm." *Abdnor*, 871 S.W.2d at 732; *see Almanza*, 686 S.W.2d at 171.

In this case, the State argues the lack of harm because the trial court submitted the defense of necessity,[17] instructing the jury: "You have heard evidence that, when the defendant shot a firearm at or in the direction of Jorge Rivera, he believed that his conduct was necessary to avoid imminent harm, to wit, death or serious bodily injury to himself or a third person, Juan Barrios." The charge further instructed, "The burden is on the state to prove, beyond a reasonable doubt, that the defendant did not act out of necessity," defined reasonable belief and deadly force, and applied the law of necessity to the facts in the following manner:

> To decide issue of necessity, you must determine whether the state has proved, beyond a reasonable doubt, one of the following:
>
> > 1.      The defendant did not reasonably believe the conduct was immediately necessary to avoid an imminent harm, in this case death or serious bodily injury to himself or a third person, Juan Barrios; or
> >
> > 2.      The desirability and urgency of avoiding death or serious bodily injury to himself or a third person, Juan Barrios did not clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law prohibiting murder or manslaughter.
>
> If you find that the state has failed to prove, beyond a reasonable doubt, at least one of these matters, you must find the defendant "not guilty."

---

[17]Necessity requires proof that the actor reasonably believed the conduct in question was "immediately necessary" to avoid "imminent harm" and that the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct. TEX. PENAL CODE ANN. § 9.22(1) (West 2011).

If you all agree the state has proved, beyond a reasonable doubt, each of the elements of the offense of murder or manslaughter, and you believe, beyond a reasonable doubt, that the defendant did not act out of necessity, you must find the defendant "guilty."[18]

Though Barrios preserved error by objecting to the trial court's failure to give an instruction on the defense of a third party, he did not present a requested instruction on that issue. So, we do not know the precise form such an issue would have taken. Also, neither party argues—in more than a passing or conclusory manner—whether the lack of such an instruction was harmful. Nonetheless, having found error, we are charged with the responsibility of assessing whether Barrios was harmed from not getting the third-party-defense instruction.

In evaluating whether there was some harm from jury charge error, we should consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171). In our analysis, neither party has a burden to show harm. *Warner v. State*, 245 S.W.3d 458, 462, 464 (Tex. Crim. App. 2008).

"[T]he presence of any harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if no harm has occurred." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986); *see Durden v. State*, 290 S.W.3d 413, 420 (Tex. App.—Texarkana 2009, no pet.). Yet, there must be actual, as opposed to possible, harm. *Medina v. State*, 7 S.W.3d 633,

---

[18]This charge on necessity was formulated from Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges-Defenses* PJC B11.3 (2010).

20

643 (Tex. Crim. App. 1999); *Durden*, 290 S.W.3d at 420 (citing *Almanza*, 686 S.W.2d at 174). Significant evidence militating against a defense-requested instruction or finding can render an error harmless. *Medina*, 7 S.W.3d at 642–43.

The record includes the fact that the trial court gave the necessity instruction rather than a third-party-defense instruction. Does the jury's rejection of the necessity defense provide us with an assurance that Barrios suffered no harm? We think it does.

We start by comparing the necessity instruction Barrios received with the instruction he should have received, defense of third party.

| Necessity | Defense of Third Party |
|---|---|
| 1. Barrios reasonably believed his action was immediately necessary to avoid an imminent harm (death or serious bodily injury to Juan); | 1. Barrios reasonably believed his action was immediately necessary to protect Juan from the use or attempted use of unlawful deadly force; |
| and | and |
| 2. the desirability and urgency of avoiding death or serious bodily injury to Juan clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law prohibiting murder or manslaughter. | 2. under the circumstances as reasonably believed by Barrios, Barrios would have been authorized to use the deadly force to defend himself from the use or attempted use of unlawful deadly force he reasonably believed threatened Juan. |

If the State disproved, beyond a reasonable doubt, either prong one or prong two of whichever defense had been charged, the defense would have been rejected, resulting in the verdict of guilt. Barrios' jury necessarily found that the State disproved at least one prong of the necessity defense. Does that suggest they would have also found that the State disproved at least one prong of the third-party defense, had that been given? We think so.

21

Given the circumstances before us, we cannot, practically, see this jury finding differently on the first prongs of the two instructions. Therefore, we focus our harm analysis, particularly, on (1) whether the jury might have rejected either defense based on a finding on only prong two and, if so, (2) whether the jury might have decided differently faced with prong two of the third-party-defense instruction.

Might the jury have rejected the defense based on just prong two? From our review of the record, we find no evidence pointed at just prong two of either defense. Closing arguments focused almost entirely on prong one and addressed the necessity defense only to a very limited extent. Also, the minimal mention of prong two in the closing argument was tangential at best, and even that was not particularly telling. The record does not suggest to us that the jury's rejection of the necessity defense was based on a finding under prong two.

Even if the jury were to reject either defense based on just prong two, nothing suggests to us that the jury might have decided the two second prongs differently. Neither prong two is particularly easy to understand. Prong two of the necessity instruction is a weighing test based on competing societal benefits and detriments. Did the harm Barrios sought to prevent to Juan clearly outweigh the harm to be prevented by the laws against murder or manslaughter? While the formulation is admittedly different for prong two of the third-party-defense instruction, it also asks the jury to weigh competing factors, the reasonableness of the defensive force used to avoid the feared harm compared to the force threatened that triggered the defense. While we could, esoterically, speculate that a jury might answer the two versions of prong two differently, nothing in this record suggests that it would have happened here.

22

We find nothing indicating that any harm resulted to Barrios in not receiving the defense-of-third-party instruction. Thus, we fail to see how Barrios was harmed by the failure to include a defense of third person instruction. We find no actual, rather than theoretical, harm. *See Flores v. State*, No. 13-08-00539-CR, 2009 WL 3136163, at *4 (Tex. App.—Corpus Christi Oct. 1, 2009, pet. ref'd) (mem. op., not designated for publication); *Banks v. State*, 955 S.W.2d 116, 119 (Tex. App.—Fort Worth 1997, no pet.)[19] (although trial court erred in failing to submit self-defense, no harm due to jury's rejection of defense of necessity).[20] Accordingly, we overrule this point of error.

*(3)     Barrios Was Not Entitled to Jury Issues on the Lesser-Included Offenses*

In points of error three and four, Barrios complains that the jury should have been charged with lesser-included offenses of aggravated assault and deadly conduct. We disagree.

We employ a two-pronged test to determine if a defendant is entitled to a lesser-included offense instruction. *Sweed v. State*, 351 S.W.3d 63, 67 (Tex. Crim. App. 2011); *Yzaguirre v. State*, 367 S.W.3d 927, 929 (Tex. App.—Texarkana 2012, pet. granted) (citing *Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005)). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Yzaguirre*, 367 S.W.3d 927 (citing *Hall*, 158 S.W.3d at 473; *Hampton v. State*, 109 S.W.3d 437, 440 (Tex. Crim. App. 2003), *abrogated on other grounds by Grey v. State*, 298 S.W.3d 644 (Tex. Crim. App. 2009)); *Lofton v. State*, 45 S.W.3d 649, 651 (Tex. Crim. App. 2001); *Bignall v. State*, 887 S.W.2d 21, 23 (Tex.

---

[19]*Banks* discusses prior versions of Chapter 9 defenses which contained the duty to retreat.

[20]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

Crim. App. 1994). "We must compare the statutory elements and any descriptive averments in the indictment for the greater offense with the statutory elements of the lesser offense." *Sweed*, 351 S.W.3d at 68 (citing *Ex parte Amador*, 326 S.W.3d 202, 206 n.5 (Tex. Crim. App. 2010); *Ex parte Watson*, 306 S.W.3d 259, 263 (Tex. Crim. App. 2009)).

Here, the State's indictment contained three separate paragraphs. The first alleged that Barrios intentionally and knowingly caused Rivera's death by shooting a firearm.[21] The second alleged that Barrios, "with intent to cause serious bodily injury . . . commit[ted] an act clearly dangerous to human life that caused the death of said Jorge Rivera, by shooting Jorge Rivera with a firearm." The last paragraph alleged Barrios intentionally or knowingly committed an act clearly dangerous to human life causing Rivera's death while in the commission of deadly conduct. Thus, Barrios was charged with murder under Section 19.02(b)(1), (2), and (3) of the Texas Penal Code. TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

A person commits an offense if the person commits assault and causes serious bodily injury or uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a) (West 2011). Because all of the elements of aggravated assault were required to prove murder in this case, aggravated assault is a lesser-included offense of murder as alleged in the State's indictment. *See Dowden v. State*, 758 S.W.2d 264, 269 (Tex. Crim. App. 1988); *see also Forest v. State*, 989 S.W.2d 365, 367–68 (Tex. Crim. App. 1999).

Likewise, a person commits the offense of deadly conduct if he or she knowingly discharges a firearm at or in the direction of one or more individuals. TEX. PENAL CODE ANN.

---

[21]The jury was instructed that a firearm is a deadly weapon.

24

§ 22.05(b) (West 2011). Because all of the elements of deadly conduct would be required to be presented to prove murder as alleged in the State's indictment, deadly conduct was also a lesser-included offense of murder. *See Daniels v. State*, 313 S.W.3d 429, 432 (Tex. App.—Waco 2010, pet. ref'd); *Miles v. State*, 259 S.W.3d 240, 247 (Tex. App.—Texarkana 2008, pet. ref'd).

However, the second part of the test requires some evidence in the record that would permit a jury to rationally find that if Barrios is guilty, he is guilty only of the lesser-included offense. *Sweed*, 351 S.W.3d at 68; *Yzaguirre*, 367 S.W.3d at 930 (citing *Hall*, 158 S.W.3d at 473). Barrios would qualify for a lesser-included offense instruction if the record contains evidence that, if believed by the jury, negates or refutes an element of the greater offense while providing a rational alternative finding on any associated element of the lesser offense, or is subject to different interpretations by the jury. *Cavazos v. State*, No. PD-1675-10, 2012 WL 5348046 (Tex. Crim. App. Oct. 31, 2012); *Yzaguirre*, 367 S.W.3d at 930 (citing *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex. Crim. App. 1992) (per curiam)). In applying the second prong, we must "examine the entire record instead of plucking certain evidence from the record and examining it in a vacuum." *Yzaguirre*, 367 S.W.3d at 930 (citing *Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993)). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Id.* (citing *Ferrel*, 55 S.W.3d at 589). In making this decision, courts do not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* (citing *Hall*, 158 S.W.3d at 473).

Here, Barrios believes that his testimony "that he did not mean to kill Rivera and only shot at his hand containing the tire tool that he was swinging at Juan" raised more than a scintilla

25

of evidence which would permit a rational jury to find that he was guilty only of aggravated assault or deadly conduct. However, a similar argument has been rejected by the Texas Court of Criminal Appeals. In *Forest*, the court determined that the defendant's testimony that he did not intend to kill that victim, but only intended to shoot the victim "in the butt" during a brawl because he was afraid, did not entitle him to an instruction on aggravated assault because "[b]y his own testimony, appellant intended to cause serious bodily injury to the victim," and the discharge of a firearm was clearly dangerous to human life. *Forest*, 989 S.W.2d at 368. In other words, the defendant's own testimony established "him, at the least, to be guilty of murder under Texas Penal Code § 19.02(b)(2)." *Id.*; *see Harrell v. State*, 659 S.W.2d 825, 827 (Tex. Crim. App. 1983) (defendant not entitled to aggravated assault instruction given his testimony that he intended to shoot victim in arm, but not to kill, given that such testimony showed him guilty under Section 19.02(a)(2), now Section 19.02(b)(2)).

Here, Barrios testified he intended to shoot Rivera in the hand. The defense stipulated that Rivera was the victim and that "his death was caused by being shot with a firearm." There was no evidence that any other person discharged a firearm. As in *Forest*, at the very least, Barrios' testimony established that: (1) he intended to cause seriously bodily injury to Rivera by shooting him in the hand; (2) that he fired a gun in Rivera's direction, an act clearly dangerous to human life; and (3) that he caused Rivera's death. Thus, because Barrios' own testimony established he was guilty of murder under Section 19.02(b), "there was no evidence that appellant was guilty only of anything less than some form of murder." *Forest*, 989 S.W.2d at 368.

Accordingly, Barrios was not entitled to the lesser-included offense instructions of aggravated assault or deadly conduct. We overrule Barrios' points of error related to the lesser-included offenses.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     September 26, 2012
Date Decided:       December 14, 2012

Publish