

# NUMBER 13-18-00690-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CEDRIC DESHAWNN GREEN,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                           Appellee.

## On appeal from the 117th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Perkes, and Tijerina
### Memorandum Opinion by Justice Perkes

A jury convicted appellant Cedric Deshawnn Green of murder and engaging in organized criminal activity, both first-degree felonies, and sentenced him to concurrent prison terms of fifty-five and sixty-five years. *See* TEX. PENAL CODE ANN. §§ 19.02, 71.02. Green challenges the sufficiency of the evidence to support his convictions under both

the legal sufficiency standard and the accomplice-witness rule.[1] He also argues that the State willfully withheld material evidence in violation of the Michael Morton Act, and therefore the trial court abused its discretion in denying his motion for a new trial. We affirm the murder conviction and reverse and render an acquittal on the engaging in organized criminal activity conviction.

## I.    BACKGROUND

### A.    Introduction

On the morning of October 21, 2017, Juan "Stephanie" Montez went into a Church's Chicken near her residence and exchanged two rolls of dimes for paper money.[2] An employee described Montez, a regular at the store, as "nervous." Later that day, a woman living in rural Nueces County heard "pops" on her property. When she looked through her window, she saw Montez crawling out of the brush asking for help. When Nueces County Sheriff's deputies arrived on the scene, they found Montez bloody and leaning against the house. Montez could hardly talk; the only thing she said to officers was, "Help me. They're trying to kill me." Montez later died from her injuries.

The Nueces County medical examiner ruled Montez's death a homicide by multiple gunshot wounds. Montez was shot a total of five times with entry wounds on both the front and back of her body. The medical examiner recovered several projectiles that investigators later identified as 9mm bullets.

At the crime scene, investigators recovered twelve casings that were the same

---

[1] Green also challenges the factual sufficiency of the evidence to support his convictions. Texas courts have not recognized a distinction between legal and factual sufficiency in criminal proceedings for ten years; the *Jackson v. Virginia*, 443 U.S. 307 (1979) legal sufficiency standard is the only standard for reviewing the constitutional sufficiency of the evidence. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.).

[2] We will refer to Montez with feminine pronouns because she identified and lived as a female.

2

caliber as the bullets recovered from Montez's body. A firearms expert testified that the casings were fired from a semi-automatic pistol. He further testified that a Taurus 9mm pistol is a widely available gun and among the many makes and models of guns that could have fired these casings and bullets.

## B.    Accomplice-witness testimony

According to Randy Dorsey, an accomplice-witness who testified for the State, he, Green, Chloe Huehlefeld, and Jace Montange conspired to kill Montez as retribution for Montez stealing $20 in dimes from Chloe. Earlier that day, Green discovered that a significant amount of his own money had gone missing. Green initially accused Dorsey, who is Green's godbrother. The two of them then went to Montez's nearby residence, where Chloe was staying, and Green put a gun in Chloe's face and said, "B****, where's my money?" Chloe, who at times had an intimate relationship with Green, denied that she took his money, and the three of them returned to Green's place. Later that day, Montez came to Green's house and purchased drugs from him. It was at this point that Chloe realized that $20 in dimes were missing from her purse.

Dorsey testified that he, Green, Chloe, and Jace drove to a nearby Church's Chicken where an employee confirmed that Montez had exchanged the $20 in dimes for paper money earlier that day. Green then told Chloe that Montez "had to learn a lesson" and that Chloe needed to "handle it."

According to Dorsey, Green was the leader of the conspiracy. They collectively lured Montez to a secluded area under false pretenses where Green prompted Chloe and Jace to shoot Montez with his gun. Specifically, Chloe called Montez to come to Green's house with the promise of a money-making opportunity. Before Montez arrived, sheets were placed on the floor of Green's car "[s]o nobody would have no evidence in the car,"

3

and Green directed each member of the conspiracy on where to sit in relation to Montez—Chloe in the front passenger seat and Jace and Dorsey on either side of Montez in the back. Green then drove the five of them in his car to the crime scene, a rural area in Nueces County.

At the scene, Chloe used Green's pistol to shoot Montez a single time, telling Montez, "B****, you gonna learn to steal from me." Green then reloaded the pistol, handed it to Jace, and said, "Go finish it." Jace chased after the fleeing Montez, firing approximately "nine" shots at her.

Afterwards, Green drove the four of them to a jetty where Jace and Green broke the gun down and threw the parts into Corpus Christi Bay. Dorsey described Chloe and Jace as "paranoid" and Green as "calm." When they got back to Green's house, Green directed them to take off their clothes "so there is no evidence." They placed the clothes into a plastic bag, drove to Green's sister's house, and Green burned the clothes in a barbecue pit.

Dorsey admitted to being high on crack cocaine and PCP at the time of the shooting, as well as taking prescribed medications for psychiatric conditions, but he claimed these drugs had no effect on his ability to clearly remember the day's events. Dorsey also acknowledged that he accepted a plea bargain in exchange for his testimony; Dorsey received a ten-year sentence, probated for ten years, for his part in the murder.[3]

---

[3] Chloe and Jace were also tried and convicted of murder and engaging in organized criminal activity. *See Huehlefeld v. State*, No. 13-18-00688-CR, 2019 WL 3331636 (Tex. App.—Corpus Christi–Edinburg July 25, 2019, no pet.) (mem. op., not designated for publication); *Montange v. State*, No. 13-19-00207-CR, 2020 WL _____ (Tex. App.—Corpus Christi–Edinburg Dec. 22, 2020, no pet. h.) (mem. op., not designated for publication) (available at http://search.txcourts.gov/Case.aspx?cn=13-19-00207-CR&coa=coa13).

4

## C.      Corroborating evidence

A Church's Chicken employee testified that three men came into the store on October 21st, asking whether Montez had exchanged the dimes for paper money. One of those men, who the employee identified in court as Green, became "angry" and "upset" when the employee confirmed that Montez had exchanged the dimes. A silent surveillance video of the exchange was played for the jury.

Investigators executed a search warrant at Green's residence. Inside a lockbox in Green's bedroom, they recovered Green's Texas identification card, a plastic bag containing a "white rock substance," and several bundles of paper money and multiple coins of various denominations totaling approximately $3,500. Other items seized included an AR-15 rifle, body armor, a small amount of marijuana, a digital scale, drug paraphernalia, and twelve cell phones.

The cell phones were turned over to Skeeter Upton, an intelligence analyst with the Drug Enforcement Agency. Upton was able to complete data extraction and file system transfers on four of the phones; the other phones were inaccessible for various reasons. Two days after Montez was murdered, the following text exchange occurred between the cellphone numbers associated with Green and his ex-wife Latoya Davis:[4]

| | |
|---|---|
| Latoya's phone:[5] | By the way umm how long is she staying at our house cause we not moving in there real talk |
| Green's phone: | Yeah… And I'll let you talk to Chloe… I'm looking at the big picture… I got her into this so its only right that we look after her until she can find somewhere to go… |

---

[4] Upton testified that he can associate a phone number with a person with the aid of commercial data bases. In this case, the phone number he associated with Green was linked to Green's Facebook account.

[5] To maintain readability, we have elected not to correct or indicate the numerous grammatical errors in the text exchange. Any ellipsis within a text message is the authors.

| | |
|---|---|
| Green's phone: | Like I told you before; you dont have to worry about me doing nothing so get that through your head Hunnie cause it's only going to cause problems between us |
| Latoya's phone: | How the f*** you get her into this you aint put no gun to her head she had all the choices yall was just on some gangster s*** and she wanted to prove to you she wasnt no punk |
| | . . . . |
| Latoya's phone: | Idk why i feel like im getting f***** around cause i see how you act around her |
| Green's phone: | I could easily wash my hands with you and say you got it… Lets keep it real… |
| Green's phone: | I dont act like s*** around her… You tripping |
| Latoya's phone: | What well if its that easly said then do it |
| Latoya's phone: | Becareful what you say to me |
| Green's phone: | S*** and the way you talking doesnt make it any better so be careful wtf you're saying ok |
| Green's phone: | Wtf does that supposed to mean? Please tell me |
| Green's phone: | You talking about opening your mouth about the s***?! |
| Latoya's phone: | Naw you say its easy though so how am I suppose to take that s*** you look at the big picture besides the rest of this bulls***…idc what yall did n**** I dont talk my business |
| Green's phone: | To tell you the truth i really dont like how you're talking |
| Latoya's phone: | WhT you mean |
| Green's phone: | U on some f*** s*** |
| Green's phone: | Like you hanging the s*** over my head…Smmfh…bet that…I Have nothing more to say…you have a good day |

The cell phone extraction of Green's cell phone also revealed two images of

Taurus pistols—one was a photograph of a black and gold Taurus 9mm pistol and the other was a screen shot of a silver and gold Taurus 9mm pistol taken while visiting taurususa.org. Additionally, call logs showed that Green's phone was used to call the cell phone of Montez's mother while Montez was visiting her on the afternoon of October 21st. This phone call was placed after Green, Chloe, Dorsey, and Jace confirmed that Montez exchanged the dimes at Church's Chicken.

**D.    Green's statement to police**

During an interview with investigators, a video recording of which was played for the jury, Green admitted to previously owning a "silver and gold" Ruger pistol. He claimed that the gun, along with $1,700, were stolen from his home prior to Montez's death. A witness testified to seeing Green with the black and gold gun depicted in the picture "two or three" days before Montez's death. Dorsey testified that the silver and gold gun depicted in the screen shot was the same gun used to shoot Montez.

During the interview, Green admitted he is a drug dealer and regularly sold Montez drugs, including crack cocaine on October 21, 2017. He also said that he previously purchased prescription drugs from Montez, and an investigator later confirmed that Montez was known to sell both illicit and prescription drugs.

Green also acknowledged that Chloe sold drugs for him, that the $20 in dimes was money he paid her for selling drugs, and that Chloe complained to him when the money went missing. He admitted to going to Church's Chicken and finding out that Montez had exchanged the coins. He also admitted to going to his sister's house on October 21st with Chloe and Dorsey.

He initially denied knowing Jace and insisted that only he, Chloe, and Dorsey were in the car at Church's Chicken. After investigators told Green they knew a "white boy" was

7

also with them, Green admitted that a guy named "Frost" had been there. Green said that he met "Frost" days earlier, did not know him well, and that October 21st was the first time they spent any significant time together.[6] He said that after they discovered that Montez had exchanged the coins at Church's Chicken, he, Chloe, and Dorsey went back to his home, and "Frost" left. When investigators asked Green whether he thought Montez was also capable of stealing his missing $1,700, he initially said no, but then agreed that "anybody" could have been the person that came into his house and stole the money.

At the end of the interview, Green warned the investigators not to accuse him of the murder "because if you shoot that s*** at me, I'm gonna get on you're a**, bro." He elaborated—in colorful language—that he does not tolerate people who mistreat him. For example, he told the investigators that if he finds out who stole his $1,700, he would "beat their mother f****** a**." "It's a promise," said Green.

### E.   Motion for new trial

The jury convicted Green of murder and engaging in organized criminal activity. His sentence was imposed on December 11, 2018. On December 12, 2018, the trial court permitted Green's trial counsel to withdraw and appointed Green appellate counsel. On February 15, 2019, Green filed a motion for a new trial. Attached to the motion is a copy of a December 20, 2018 email from the prosecutor to Green's appellate counsel, among others. In the email, the prosecutor implies that although the State previously produced "the vast majority" of the data extracted from the seized cell phones, not all the data was

---

[6] Prior to the admission of the video, the State agreed to exclude certain statements by Green in which he acknowledges being a member of a criminal street gang and meeting Jace Montange through his membership in the same gang. The State explained that it agreed to exclude these statements because "we don't have any belief that this was a concerted gang activity[,] [and] . . . the jury could improperly think that this is somehow a gang activity." Accordingly, Green was not indicted for, and the jury was not instructed on, the offense of engaging in organized criminal activity as a member of a criminal street gang. *See* TEX. PENAL CODE ANN. § 71.02(a).

produced. Green argued in his motion that this data, which he described as GPS information, text messages, call logs, social media information, and photos, "could prove to be exculpatory." The additional data is not attached to Green's motion, and Green's counsel has since acknowledged to this Court that he has not reviewed the undisclosed data.[7] The trial court did not hold a hearing, and the motion was overruled by operation of law. This appeal ensued.

## II.     SUFFICIENCY OF THE EVIDENCE

### A.     Standard of Review & Applicable Law

When reviewing claims of legal insufficiency, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). The fact finder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the testimony and is presumed to have resolved any conflicts in the evidence in favor of the verdict. *See Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008); *see also Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (giving deference to the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

"Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Winfrey v. State*,

---

[7] During oral argument, Green's counsel explained that, "After trial, we were given a list of files that were not disclosed to the defense." He further explained that, "Nobody knows whether this information could have been used" because "[w]e do not know what was in the material given after trial." When asked whether he sought the undisclosed files from the State, Green's counsel responded, "I did not get those."

9

393 S.W.3d 763, 771 (Tex. Crim App. 2013) (citing *Hooper*, 214 S.W.3d). Juries are permitted "to draw reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

Even if legally sufficient, a defendant cannot be convicted solely on accomplice witness testimony; there must be other evidence tending to connect the defendant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14. As a statutorily imposed rule, the constitutional legal sufficiency standard under *Jackson v. Virginia* does not apply to non-accomplice evidence. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Instead, to satisfy the rule, "the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997) (alteration in original). Every case must be evaluated on its own facts. *Id.* (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)). While a defendant's mere presence at the crime scene is insufficient, this fact, coupled with other suspicious circumstances, may tend to connect the defendant to

the crime. *Id.* (citations omitted).

**B.     The evidence was legally sufficient to support Green's murder conviction**

A hypothetically correct jury charge would instruct the jury to find Green criminally responsible as a party to Montez's murder if Chloe and Jace, with the intent to cause seriously bodily injury, committed an act clearly dangerous to human life that caused Montez's death, and Green, acting with the intent to promote or assist in the commission of the offense, solicited, encouraged, directed, or aided Chloe and Jace to commit Montez's murder. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), 19.02(b)(2). We conclude that Dorsey's accomplice-witness testimony alone was legally sufficient to support Green's murder conviction. *See Taylor v. State*, 10 S.W.3d 673, 684–85 (Tex. Crim. App. 2000) (explaining that uncorroborated accomplice witness testimony can be legally sufficient under *Jackson v. Virginia*). Dorsey identified Green as the leader of the conspiracy to murder Montez, explaining how Green offered direction, encouragement, and aid throughout the planning and commission of the offense. Green's sole challenge to Dorsey's testimony was that Dorsey was not credible based on his history of drug use and mental illness, as well as the plea bargain he received in exchange for his testimony. However, credibility determinations are the sole province of the jury, and we must presume that the jury found Dorsey's version of events credible. *See Bartlett*, 270 S.W.3d at 150; *Whatley*, 445 S.W.3d at 166. We overrule Green's legal sufficiency challenge to his murder conviction.

**C.     The State sufficiently corroborated Dorsey's accomplice testimony**

Even if Dorsey's testimony was legally sufficient, Green argues that his murder conviction should be overturned because the State failed to sufficiently corroborate Dorsey's testimony under the accomplice-witness rule. *See* TEX. CODE CRIM. PROC. ANN.

11

art. 38.14. We disagree; the State offered a significant amount of non-accomplice evidence "tending to connect" Green to the murder. *See id.*

Perhaps the most compelling non-accomplice evidence were the text messages between Green and Latoya two days after the murder.[8] These texts corroborated Dorsey's testimony that Green orchestrated the murder and Chole shot Montez, beginning with Green's admission that, "I got [Chloe] into this so its only right that we look after her until she can find somewhere to go." While Latoya disagreed that Green was responsible for Chloe's actions, she nonetheless linked Green to the murder by saying "yall was just on some gangsta s*** and she wanted to prove to you she wasnt no punk." Furthermore, Green asked Latoya if she was "talking about opening her mouth" and then accused her of "hanging the s*** over [his] head." *See Hyde v. State*, 846 S.W.2d 503, (Tex. App.—Corpus Christi–Edinburg 1993, pet ref'd) (noting that consciousness of guilt "is perhaps one of the strongest kinds of evidence of guilt." (citing *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.))). Finally, in an attempt to reassure Green, Latoya implicated him again, saying "[I don't care] what yall did . . . I dont talk my business."[9] Because this evidence alone sufficiently connected Green to the murder, we overrule Green's challenge to his murder conviction under the accomplice-witness rule.[10] *See Cerna v. State,* 441 S.W.3d 860, 866 (Tex. App.—Houston [14th Dist.] 2014, pet.

---

[8] Based on the content and context of the messages, it was reasonable for the jury to infer that the text messages sent from Green and Latoya's known cell phone numbers were authored by Green and Latoya. *See Butler v. State*, 459 S.W.3d 595, 603 (Tex. Crim. App. 2015) (citing *Tienda v. State*, 358 S.W.3d 633, 641 & n.34 (Tex. Crim. App. 2012)).

[9] Davis, who previously testified on behalf of the State in Chloe's trial, was excluded from testifying in this case because, contrary to Green's discovery request, the State failed to disclose that it granted Davis immunity in exchange for her testimony.

[10] We note that later in his brief Green seems to concede that the cell phone data was sufficient non-accomplice evidence. Describing it as "damaging, harmful evidence," Green claims that "[w]ithout this digital evidence consisting of texts, social media pictures, phone calls and websites[,] it would have been impossible for the jury to convict based on Dorsey's testimony alone."

ref'd) (finding text messages, among other evidence, corroborated accomplice's testimony); *see also Walker v. State*, No. 06-15-00136-CR, 2016 WL 1600268, at *1 (Tex. App.—Texarkana Apr. 21, 2016, pet. ref'd) (mem. op., not designated for publication) (holding text messages from accomplice's cell phone alone were sufficient to corroborate accomplice's testimony).

## D.   The evidence was legally insufficient to support Green's conviction for engaging in organized criminal activity

While the State proved that Green and his three accomplices conspired to murder Montez, there is no evidence in the record that the murder was committed with the intent to establish, maintain, or participate in a combination. *See* Tex. Penal Code Ann. § 71.02(a)(1); *Rodriguez v. State*, 90 S.W.3d 340, 354 (Tex. App.—El Paso 2001, pet ref'd) ("The State is required to prove that the defendant committed the predicate offense with the specific intent to participate in or facilitate a combination.")

A hypothetically correct jury charge would instruct the jury to find Green guilty of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination, Green conspired to commit Montez's murder. *See* Tex. Penal Code Ann. § 71.02(a)(1). A "combination" is "three or more persons who collaborate in carrying on criminal activities." *Id.* § 71.01(a).

The Texas Court of Criminal Appeals has explained that the phrase "collaborate in carrying on criminal activities" requires the State to "prove more than that the appellant committed or conspired to commit one of the enumerated offenses with two or more other people." *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999); *see also O'Brien v. State*, 544 S.W.3d 376, 389 (Tex. Crim. App. 2018) (deciding that engaging in organized criminal activity is a "circumstances surrounding the conduct" offense and explaining that

13

the statute's primary focus is organized crime). Thus, a conspiracy among three or more people to commit murder, without more, is insufficient to prove the additional offense of engaging in organized criminal activity. *Nguyen*, 1 S.W.3d at 697. The State must also establish the existence of a combination, and to do so, the State must prove the defendant committed the murder with the intent "to work together in a continuing course of criminal activities." *Id.* The combination may be ongoing at the time the predicate offense is committed or the evidence may support a showing that the predicate offense was committed with the intent to "establish" a combination. *Id*; *see, e.g.*, *Barber v. State*, 764 S.W.2d 232, 236–37 (Tex. Crim. App. 1988) (holding evidence sufficient to support intent element where scheme to steal oil was proven by evidence that collaborators put up money for the operation, leased property where stolen oil would be stored, set up telephone service at terminal where oil would be sold, moved oil storage tanks to the leased property, purchased trucks and hired drivers to transport the stolen oil, opened a bank account, and made agreements for the sale of the oil).

The State's theory of the case, as expressed in the indictment, jury charge, and presentation to the jury, was that it could satisfy the intent element of the offense by merely proving that the conspirators committed more than one predicate offense. The State alleged in the indictment that Green and his accomplices committed the offenses of "Murder and/or Aggravated Assault" with the intent to establish, maintain, or participate in a combination. Like murder, aggravated assault is a predicate offense under the organized criminal activity statute. *See* TEX. PENAL CODE ANN. § 71.02(a)(1). Under the State's theory, proving the commission of more than one predicate offense necessarily

14

constitutes "carrying on criminal activities."[11] *See id.* § 71.01(a). We disagree.

As the Texas Court of Criminal Court has previously explained—and the plain language of the statute suggests—the State must prove that a predicate offense was committed with the intent "to work together in a *continuing course* of criminal activities." *Nguyen*, 1 S.W.3d at 697 (emphasis added). Thus, we fail to see how committing two predicate offenses *simultaneously*, especially when one is a lesser-included offense of the other, *see Barrios v. State*, 389 S.W.3d 382, 399 (Tex. App.—Texarkana 2012, pet ref'd), indicates an intent to collaborate in criminal activities over a period of time. *See* TEX. PENAL CODE ANN. § 71.01(a); *Nguyen*, 1 S.W.3d at 697.

Moreover, the engaging statute specifically contemplates that a person commits a single offense of engaging if, with the requisite intent, "the person commits or conspires to commit one *or more* of the [predicate offenses]." TEX. PENAL CODE ANN. § 71.02(a) (emphasis added); *see also id.* § 71.02(b) (explaining that "an offense under this section is one category higher than the *most serious offense* . . . committed) (emphasis added). In other words, the intent element is a distinct and separate element and the commission of multiple predicate offenses may, but does not necessarily, indicate an intent to establish, maintain, or participate in a combination. *See id.* § 71.02(a); *see also O'Brien*,

---

[11] During closing, the State explained the engaging charge and its supporting evidence as follows:

Let's talk about engaging in organized criminal activity. If you would, please, turn to page 9 of your Charge. You're going to see here "Combination." A combination means three or other [sic] persons who collaborated on any ongoing criminal activities. What we're talking about here, very similar to the law of parties, right? You heard of the law of parties. Chloe and Jace shot, but [Green] set it up, he gave them the gun, he put the gun in Jace's hand with the loaded clip and said, "Finish the job." He encouraged them. And that's very similar to what we have here, in engaging in organized criminal activity. Three or more people engaging in a combination to carry on criminal activity, aggravated assault and murder. It's pretty simple. It may sound confusing, but it's really not, when you look at it. That's exactly what we have here, [Dorsey], Jace, Chloe, and [Green] planned out a murder and carried it out. And because of that, they're guilty of murder, they're guilty of engaging in organized criminal activity.

544 S.W.3d at 389 (explaining that the inclusion of the phrase "one or more of the following" in the statute "demonstrates the Legislature's focus upon the creation or existence of a criminal combination rather than upon a specific predicate offense."). To hold otherwise would render the intent element superfluous. *See Ex parte Forward*, 258 S.W.3d 151, 154 (Tex. Crim. App. 2008) ("When engaging in statutory construction, we generally presume that 'the entire statute is intended to be effective.'" (quoting TEX. GOV'T CODE ANN. § 311.021)).

In this case, "[t]he evidence does not indicate that there was any intent to form a group to carry on criminal activities, and the State does not point to any evidence in the record that supports such a finding." *See Nguyen*, 1 S.W.3d at 697. According to Dorsey, the conspiracy's sole objective was to teach Montez "a lesson" for stealing. The State's other evidence corroborated his account. There is no evidence in the record that a combination existed prior to Montez's murder, and there is no evidence in the record that the conspirators intended to collaborate in ongoing criminal activities after the murder. *See id.* Because a conspiracy among three or more people to commit murder alone is insufficient to prove the additional offense of engaging in organized criminal activity, we sustain Green's legal sufficiency challenge to his conviction for engaging in organized criminal activity. *See id*.

### III. MOTION FOR A NEW TRIAL

Green also argues that the trial court erred in failing to grant him a new trial because the State failed to timely disclose material evidence under the Michael Morton Act. *See* TEX. CODE CRIM. PRO. ANN. art 39.14. We review a trial court's denial of a motion for new trial for an abuse of discretion. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006) (citing *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995)). "A trial court

16

abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling." *Id.* (citing *Lewis*, 911 S.W.2d at 7).

During oral argument before this Court, Green acknowledged that his motion for new trial—filed more than two months after his sentence was imposed—was untimely. *See* TEX. R. APP. P. 21.4(a) (establishing a thirty-day deadline to file a motion for new trial from the date the trial court imposes the sentence in open court). A trial court has no authority to grant an untimely motion for new trial. *State v. Moore*, 225 S.W.3d 556, 569 (Tex. Crim. App. 2007). Thus, the trial court did not abuse its discretion in denying Green's untimely motion because it had no discretion to grant the motion in the first instance. *See id.* Without reaching the merits of Green's motion for new trial, we overrule his third issue.[12]

## IV.  CONCLUSION

We affirm Green's murder conviction. We reverse and render an acquittal on Green's conviction for engaging in organized criminal activity.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
22nd day of December, 2020.

---

[12] We note that the untimely filing by Green's appellate counsel does not preclude Green from ultimately having the issue decided on the merits; he may raise the issue in a post-conviction application for habeas relief. *See Diamond v. State*, NO. PD-1299-18, 2020 WL 3067582, at *7 (Tex. Crim. App. June 10, 2020).