

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00107-CR

CHARLES JEROME CARTER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 21F0222-005

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

A Bowie County jury convicted Charles Jerome Carter of murder. After finding the State's punishment enhancement allegations true, the jury assessed a sentence of life imprisonment and a $10,000.00 fine. On appeal, Carter argues that his trial counsel rendered ineffective assistance because he failed to request instructions for self-defense and a lesser-included offense during guilt/innocence. Carter also argues that, during punishment, his counsel should have objected to the lack of any presentment or plea to the punishment-enhancement allegations and should have requested a sudden-passion instruction.

We find that Carter cannot show that his counsel was ineffective because he was not entitled to self-defense or lesser-included-offense instructions. We also find that Carter's stipulation to the prior enhancement allegations removed any prejudice from the lack of a presentment and plea to the punishment-enhancement allegations and that counsel was not ineffective by failing to request a sudden-passion instruction. As a result, we affirm the trial court's judgment.

## I.  Standard of Review for Ineffective Assistance of Counsel

As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). "[T]o prevail on a claim of ineffective assistance of counsel, [the defendant] must satisfy the two-prong[ed] test set forth in *Strickland v. Washington*, 466 U.S. 668, [687–88] . . . (1984)." *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009) (orig. proceeding). A failure to make a showing under

either prong of the *Strickland* test defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

To prove ineffective assistance of his counsel, Carter must show that (1) trial counsel's representation fell below an objective standard of reasonableness, based on prevailing professional norms, and (2) there is a reasonable probability that the result of the proceeding would have been different but for trial counsel's deficient performance. *See Strickland*, 466 U.S. at 687–95; *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986). A "reasonable probability" means a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

## II.    The Evidence at Guilt/Innocence

Officers from the Texarkana, Texas, Police Department (TTPD) and the Texarkana, Arkansas, Police Department (TAPD) responded to an emergency at a Whataburger parking lot on January 12, 2021, at 11:25 a.m. The officers found twenty-nine-year-old Nick Muldrow alone and unresponsive in the driver's seat of his blue Cadillac Deville next to a firearm and "a rather large bag of a green, leafy substance," later confirmed to be 977.56 grams of marihuana. Officers removed Muldrow from the car and discovered that he had been shot in the chest and leg. Despite first aid treatment, Muldrow did not survive his injuries.

The TTPD and TAPD secured the crime scene and began speaking with witnesses. Joshua Guy spoke with Cody Harris, a TTPD sergeant, and said that he had seen an African-American male fire a gun around lunchtime. According to Harris, Guy had witnessed a struggle in Muldrow's car. Guy testified that someone had dropped a black suitcase and a cellphone on

3

the ground before driving away in a black sports utility vehicle (SUV). Officers located the suitcase and cellphone at the scene and secured them along with a cigarette butt found close by.

Amanda Temple, another eyewitness, spoke with TTPD Detective Craig Buster. Temple testified that, after hearing a gunshot, she witnessed someone get out of Muldrow's car and get into a black Nissan or Chevrolet SUV with "two to three guys in the vehicle." Temple said the black SUV fled the parking lot immediately after the shooting.[1] Officers recovered video-surveillance footage from businesses in the area depicting Muldrow's vehicle and the suspect vehicle. Video-surveillance footage showed that, when Muldrow's car pulled up close to the black SUV, someone exited the SUV and entered Muldrow's car. A few seconds later, the same person hurriedly returned to the SUV, and it sped off. The surveillance footage showed that the suspect vehicle was a black Nissan Rogue.

After Muldrow was transported to the hospital, officers processed his vehicle. Joshua Jones, a TAPD officer, testified that the gun inside the car was a Smith & Wesson SD40 handgun with a .40 caliber cartridge case jammed inside. Officers also found a bullet that had penetrated through the driver's side seat. Aaron Lewis, an investigator with the TTPD, conducted a firearm trace of the gun, which revealed that it had been purchased from Academy Sports + Outdoors by Bria Page, who lived in a house on Citation Street. Lewis then realized that Page had called TTPD about an hour after Muldrow's murder to report her gun stolen. When TTPD Officer Scott Eudy asked Page for the serial number of the gun, Page said that she would supply the information but never did.

---

[1]Temple told officers that she believed one of the suspects in the SUV was Marques Thompson. Harris testified that Thompson was arrested but was released after providing a solid alibi.

Officers obtained a search warrant for Page's home. Buster testified that he and Jones executed the warrant and were surprised when they saw a black Nissan Rogue parked at Page's house. Inside of the SUV, Jones found a spent .40 caliber cartridge case, like the one found in Muldrow's car. Jones testified that they found a Smith & Wesson gun box in Page's closet and that the serial number on the box matched the serial number of the weapon recovered from Muldrow's car. Buster testified that he noticed a photograph of Page hugging her boyfriend, an African-American male who "appeared to be the same subject that was on the background lock screen of the cellular device that was recovered from the crime scene." Page identified her boyfriend as Carter.

Page testified that she started dating Carter in December 2020 and that he soon moved in with her. She said the SUV was her vehicle and that she had just purchased a new white Cadillac for Carter for Christmas. According to Page, Carter had stayed out playing dice on the night before the shooting but returned home drunk in the early hours of January 12. Page testified that Carter was still asleep when she left for work in the morning in her SUV but that he was gone when she came home before lunch. Page said she hung up the keys to the SUV and took the Cadillac back to work so she could eventually take it to be registered. Bonderick Nard, Carter's cousin and best friend, called Page after lunch and told her to report her gun stolen. Page, who heard Carter, Nard's brother Ikil Banks, and a baby in the background of the call, complied with Nard's request. When Page returned home after work, she noticed that Carter had packed his clothes and left. Page's SUV was in her driveway, but Carter's mother had the keys.

Later, Carter called Page using Banks's phone and asked her to meet him in Little Rock, Arkansas. Page met Carter, Banks, and Nard, and they went to Walmart to get Carter a new phone after he claimed his had been stolen. After spending the night at Carter's grandmother's house in Little Rock, Page returned to Texarkana, leaving Carter behind. That day, Carter told Page to clean out her SUV. When she did, she found a shell casing in the floorboard of the back seat but maintained that she still did not know Carter had been involved in a murder.

Phillip Duong, a forensic firearm and toolmarks examiner for the Texas Department of Public Safety Crime Laboratory, testified that the laboratory received Page's Smith & Wesson found in Muldrow's vehicle, a magazine, three fired cartridge casings, and two fired bullets. In Duong's opinion, all of the cartridges and bullets were fired from Page's gun. Even though fingerprint analysis from the magazine of the firearm revealed Nard's prints, officers located social media postings showing Carter prominently displaying Page's gun.

Brian Tribble, a detective with TAPD, testified that the phone left at the scene had an Android identification number and "an email account of . . . carterg10flat@gmail.com." Harris testified that Carter's photo was on the phone's background and that analysis of the phone when compared to Muldrow's phone showed several calls between Carter and Muldrow leading up to the minutes before the murder. Analysis of Nard's cellphone showed that he had called Carter's mother after the murder at 11:50 a.m. Alisha Lagrini, a forensic scientist with the Texas Department of Public Safety Garland Crime Laboratory, testified that Carter and Muldrow had both contributed to the DNA found on the cellphone and that Nard was excluded as a contributor of the DNA. DNA analysis also showed that Nard had smoked the cigarette left at the scene.

6

Critically, Lagrini testified that a swab of Muldrow's left hand fingernail clippings had a mixture of DNA and that Carter was a possible contributor to that DNA mixture.

At trial, the testimony of Carter's family members was favorable to the State. Lasherika Anderson, Carter's cousin who lived in Little Rock, testified that Carter called her while in Little Rock to borrow a phone charger. According to Anderson, Carter told her the "details of what happened and why he felt like he had to do it." Carter told Anderson that he had met Muldrow "to do a drug exchange" but that Muldrow reached for Carter's money after Carter got into Muldrow's car. Anderson testified, "They got to tasseling. [Carter] told me he ended up shooting the guy twice, and that he dropped his phone at the scene, and that's why now he has this phone, and he was asking for a charger." Anderson said that, "from [her] understanding, it was more of a self-defense."

Stephanie Fulton, Carter's aunt and Nard and Banks's mother, testified that she spoke to Carter a few days after the shooting.[2] According to Fulton, Carter "was kind of shaken up" and said that he had met Muldrow to "do a weed exchange" but that Muldrow grabbed Carter and they started struggling. Fulton testified that Carter admitted to shooting Muldrow, retrieving his money from Muldrow, and fleeing the scene in the SUV. Fulton said she advised Carter to turn himself in.

After hearing this evidence, the jury convicted Carter of murder.

---

[2]Nard, who sold drugs with Vance Brown, was later murdered by Brown.

### III. Counsel Was Not Ineffective in Failing to Seek Defensive Instructions During Guilt/Innocence

Carter argues that his counsel rendered ineffective assistance by failing to seek self-defense and lesser-included-offense instructions. Because we conclude that Carter cannot meet the first *Strickland* prong, we disagree.

Under the first *Strickland* prong, "the defendant must prove, by a preponderance of the evidence, that there is . . . no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). We note that judicial scrutiny of counsel's performance must be highly deferential, and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). We apply a strong presumption that trial counsel was competent and presume that counsel's actions and decisions were reasonably professional and motivated by sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Also, when an appellate record is silent on why trial counsel failed to take certain actions, "the appellant has failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

Here, the record is silent as to why counsel did not object to the jury charge. In light of the evidence presented at trial, we find it likely that counsel decided not to request the defensive instructions Carter wished for because he reasonably determined that Carter was not entitled to them.

8

**A.     Reasonable Counsel Could Have Found Self-Defense Inapplicable**

On the record before us, we find that Carter's counsel could have reasonably determined that the theory of self-defense was not available to Carter (1) since he did not meet the confession and avoidance doctrine and (2) since Muldrow did not use deadly force against Carter.

"Confession and avoidance is a judicially imposed requirement that requires defendants who assert a justification defense to admit, or at a minimum to not deny, the charged conduct." *Rodriguez v. State*, 629 S.W.3d 229, 231 (Tex. Crim. App. 2021).  Because it can justify the commission of an offense, "[s]elf-defense is a confession-and-avoidance defense requiring the defendant to admit his otherwise illegal conduct." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010) (finding that a defendant cannot both invoke self-defense and flatly deny the charged conduct).

Here, Carter did not admit to any element of the offense.  He suggested at trial that Nard could have been the shooter since his fingerprints were found on the magazine.  Even after his family's testimony, Carter cross-examined them on whether they were trying to protect Nard's memory.  Carter's closing argument, excerpted below, showed that Carter did not even agree that he was at the scene:

> The state would never be able to, and they haven't, shown you Charles Carter --
> showing Charles Carter holding a firearm on the date of January 12, 2021.  They
> haven't shown Charles Carter was at the scene of this murder.  They've shown
> you evidence of his cell phone being there, but not Charles Carter.  They
> presented no evidence, and I said this in the opening, of Charles Carter firing a
> firearm.  And most importantly, they have not shown Charles Carter committing
> any act leading to the death of Nicholas Muldrow.

9

Given that counsel could have been instructed by Carter to deny each element of the offense, we find it reasonable for counsel to have determined not to employ a confession-and-avoidance strategy and, as a result, for counsel to have concluded that Carter could not seek a self-defense instruction.

Moreover, under Section 9.32 of the Texas Penal Code, Carter would only be justified in using deadly force against Muldrow (1) if he would be justified under Section 9.31 and (2) when and to the degree Carter reasonably believed the deadly force was immediately necessary to protect himself from Muldrow's use of unlawful deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a)(1)–(2); *Barrios v. State*, 389 S.W.3d 382, 394 (Tex. App.—Texarkana 2012, pet. ref'd). "The actor's belief . . . that the deadly force was immediately necessary . . . is presumed to be reasonable [only] if the actor . . . was not otherwise engaged in criminal activity, other than a Class C misdemeanor . . . ." TEX. PENAL CODE ANN. § 9.32(b)(3).

In reading the statutory language, counsel could have reasoned that the evidence failed to show that Muldrow used unlawful deadly force against Carter, which was required to justify Carter's use of deadly force. Also, since the evidence demonstrated that Carter was involved in an illegal drug transaction, counsel could have concluded that Carter's belief that deadly force was required would not be presumed reasonable.

Based on this silent record, we find that counsel's decision to refrain from seeking a self-defense instruction did not fall below an objective standard of reasonableness, based on prevailing professional norms. As a result, we find that Carter cannot meet the first *Strickland* prong, and we overrule his first point of error.

10

**B.      Reasonable Counsel Could Have Found No Evidence of a Lesser Offense**

In his second point of error, Carter argues that his counsel should have requested the trial court to submit an instruction on the lesser-included offense of manslaughter. Based on *Cavazos v. State*, 382 S.W.3d 377, 385–86 (Tex. Crim. App. 2012), we disagree.

The determination of whether to submit a lesser-included-offense issue to the jury is subject to the two-part "*Aguilar/Rousseau* test." *Id.* at 382. "First, the court determines if the proof necessary to establish the charged offense also includes the lesser offense." *Id.* Second, "the court must then consider whether the evidence shows that if the Appellant is guilty, he is guilty only of the lesser offense." *Id.* While *Cavazos* determined that proof necessary to establish murder also includes the lesser offense of manslaughter, it also illustrated why Carter's counsel could have determined that he could not meet the second requirement of the *Aguilar/Rousseau* test. *See id.* at 384.

As explained in *Cavazos*, to meet the second requirement,

[t]here must be some affirmative evidence that Appellant did not intend to cause serious bodily injury when he shot the victim . . . and must be some affirmative evidence from which a rational juror could infer that Appellant was aware of but consciously disregarded a substantial and unjustifiable risk that death would occur as a result of his conduct.

*Id.* at 385. Carter argues that his family's testimony was sufficient to establish the second requirement. "While it is true that the evidence may be weak or contradicted, the evidence must still be directly germane to the lesser-included offense and must rise to a level that a rational jury could find that if Appellant is guilty, he is guilty only of the lesser-included offense." *Id.* "Meeting this threshold requires more than mere speculation—it requires affirmative evidence

11

that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id.*

In *Cavazos*, a witness testified that Cavazos told her that he did not mean to shoot anyone. As a result, Cavazos argued that the intent element of the greater offense was negated by that testimony because it showed there was "no evidence that he intentionally pulled the trigger." *Id.* Cavazos reasoned that "pulling out a loaded gun in a room full of people is a reckless act and that shooting directly at a person twice is still reckless as long as the evidence shows no intent to do so." *Id.* The Texas Court of Criminal Appeals disagreed. *Id.* In doing so, it reasoned,

> There was no evidence directly germane to recklessness. Pulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend "I didn't mean to shoot anyone" does not rationally support an inference that Appellant acted recklessly at the moment he fired the shots. The evidence here does not support a finding of recklessness and does not rise to [the] level that would convince a rational jury to find that if Appellant is guilty, he is guilty of only the lesser-included offense.

*Id.*

We find that counsel could have reasonably concluded that the same reasoning in *Cavazos* applied here. The evidence showed that Carter responded to Muldrow's attempt to take his money by pulling out a gun. Despite Fuller's and Anderson's testimony, nothing showed that Carter was merely reckless in pointing the weapon at Muldrow and firing twice while in close range. In the absence of something more, we cannot find that counsel was unreasonable in concluding there was no evidence directly germane to recklessness and that, as a result, Carter

12

would not have been entitled to an instruction on the lesser-included offense of manslaughter. Accordingly, we overrule Carter's second point of error.[3]

## IV. Counsel Was Not Ineffective at Punishment

Next, Carter raises two grounds of ineffective assistance during punishment—statutory error and failure to submit a sudden-passion instruction. We find that Carter cannot meet the *Strickland* test on these grounds.

### A. Carter Was Not Prejudiced by Statutory Error

The State alleged two punishment enhancement allegations: (1) that Carter "was finally convicted on January 12, 2009, of the felony offense of Burglary of a Habitation in the 202nd District Court of Bowie County, Texas, in cause number 08F0806-202" and (2) that Carter "was finally convicted on February 14, 2011, of the felony offense of Aggravated Robbery in the 5th District Court of Bowie County, Texas, in cause number 10F0774-005." The reporter's record shows that, contrary to the requirements of Articles 36.01 and 37.07 of the Texas Code of Criminal Procedure, the punishment enhancement allegations were not presented to the jury, and Carter made no plea on the enhancement allegations. *See* TEX. CODE CRIM. PROC. ANN. art. 36.01, art. 37.07 (Supp.). As a result, Carter argues that his counsel rendered ineffective assistance by failing to object to the statutory errors.

Assuming that Carter meets the first *Strickland* prong to show that his counsel should have objected, we find that he cannot meet the second *Strickland* prong. *See Linton v. State*, 15

---

[3]We also note that Carter's brief stated the following: "Admittedly, such a decision to not request a lesser-included[-]offense instruction could be part of a reasonable all-or-nothing trial strategy. *See Ex parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004) [(orig. proceeding)]."

S.W.3d 615, 620 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("Because the failure to read enhancement[] paragraphs and a defendant's plea to the jury is statutory error, the proper harm analysis is that for reviewing non-constitutional error." (citing TEX. R. APP. P. 44.2(b))).

Here, Carter stipulated to the judgments of conviction showing that he was previously convicted of the burglary of a habitation and aggravated robbery, as alleged by the State's punishment enhancement allegations. Because of the stipulation, we find that Carter cannot show there was a reasonable probability that the result of the proceeding would have been different but for trial counsel's deficient performance. As a result, we overrule Carter's third point of error.[4]

**B.      Counsel Was Not Ineffective by Failing to Request a Sudden-Passion Instruction**

"At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (Supp.). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.* "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2) (Supp.). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of

---

[4]At punishment, Carter also stipulated to judgments showing that he was convicted of engaging in delinquent conduct as a minor, unlawfully carrying a weapon, burglary of another habitation, and possession of marihuana.

ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1) (Supp.).

Here, "we cannot find counsel deficient because the existing direct-appeal record is inadequately developed." *Hart v. State*, 667 S.W.3d 774, 777 (Tex. Crim. App. 2023). "For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection." *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986) (citing *Daniels v. State*, 645 S.W.2d 459 (Tex. Crim. App. 1983)). Counsel could have decided to forego a sudden-passion instruction because he could have found that, at best, Carter's family's testimony established only that he was afraid of Muldrow, but "a mere claim of fear . . . does not establish the existence of sudden passion arising from an adequate cause." *Id.* (finding that a defendant's claim that he was scared of the deceased was insufficient to raise the issue that he was acting under the immediate influence of sudden passion arising from an adequate cause). Counsel could have also decided that, even though testimony showed that Carter reacted to Muldrow's attempt to rob him and that Muldrow was large and strong, there was no testimony to indicate that Carter "became enraged, resentful or terrified immediately prior to the shooting," especially since he was the only person with a deadly weapon. *Id.*; *see Willis v. State*, 936 S.W.2d 302, 309 (Tex. App.—Tyler 1996, pet. ref'd).

On this silent record, Carter cannot defeat the strong presumption that counsel's decisions during the trial fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 782. Since nothing in the record supports the conclusion that trial counsel's failure to request a sudden-passion instruction was so outrageous that no

15

competent attorney would have failed to request it, we hold that Carter failed to establish *Strickland*'s first prong.  Consequently, we overrule Carter's last point of error.

## V.     Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:     January 26, 2024
Date Decided:       February 21, 2024

Do Not Publish