**Motion for Rehearing Granted in Part; Memorandum Opinion of July 18, 2024, Withdrawn; Judgment of July 18, 2024, Vacated; and Substitute Memorandum Opinion filed August 27, 2024.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-23-00145-CR

**AUSTIN DANIEL HOFF, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause No. 1522694**

## S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

Appellant Austin Daniel Hoff shot and killed Complainant Steven Senter outside the home of Appellant's ex-girlfriend. A jury found Appellant guilty of murder and assessed punishment at 23 years' confinement. Appellant raises five issues on appeal challenging (1) the jury instructions, (2) certain statements made in the State's closing argument, and (3) the sufficiency of the evidence supporting the jury's rejection of Appellant's self-defense claim.

We issued our original memorandum opinion in this case on July 18, 2024. Appellant filed a motion for rehearing. We grant Appellant's motion for rehearing, grant the requested relief in part, withdraw the previous opinion of July 18, 2024, and issue this substitute memorandum opinion. For the reasons below, we affirm the trial court's judgment.

## BACKGROUND

Appellant and Kristine started dating in October 2013, when Appellant was 19 years old and Kristine was 21. The couple dated for approximately three years before moving to Austin together in May 2016. After Kristine discovered that Appellant was texting another woman, she moved back to her mother's Houston home in July 2016.

Appellant sent Kristine a text message two weeks later, apologizing for the incident and telling Kristine he wanted to get back together. Appellant and Kristine continued to communicate and spent three weekends together in August, discussing whether to continue pursuing their relationship.

Appellant returned to Austin from Houston on Sunday, August 28, feeling like his relationship with Kristine was in a "good" place. According to Kristine, Appellant then accessed her Facebook account and saw that she had been messaging Complainant. Appellant drove from Austin to Houston after work the following Wednesday and arrived at Kristine's home at approximately 11:00 p.m. Appellant told Kristine he "thought [they] were moving in the right direction and then all of a sudden she started seeing [Complainant] and it was a surprise." Appellant acknowledged being "upset." Appellant left shortly thereafter to return to Austin.

Appellant drove to Houston again the following Sunday, arriving shortly

2

after midnight. Appellant "let [him]self in with a key" to Kristine's mother's home and walked into the living room, where Kristine was talking with a friend. Kristine recalled being "stunned" at the sight of Appellant and said neither she nor her mother had given Appellant permission to come to the house. According to Kristine, her friend left and she and Appellant "went to the couch to sit down to talk." Kristine said Appellant was "trying to kiss [her] and take [her] clothes off" even though she did not "indicate that [she] wanted any of that." Kristine said she "started crying [and] explaining that [she] was really, really tired of a lot of things going on." Appellant and Kristine agreed to talk more the next day.

Appellant returned to Kristine's home at approximately 9:00 a.m. the following morning. When Appellant arrived, he saw Complainant's car parked in the driveway. Appellant knocked on the door and spoke briefly to Kristine, who expressed that they would "talk about this later" because she had "a lot going on today." Appellant said he continued to try to contact Kristine throughout the day but she would not respond. According to Kristine, Appellant's messages repeatedly stated that he "wanted to talk" and that he "wanted [her] to come back with him" to Austin. Kristine said her mother called her, too, and told Kristine she saw Appellant parked across the street from their home. Kristine said she kept "pushing" her interactions with Appellant, "hoping that maybe he would eventually leave before [she] got home."

Kristine and Complainant returned to her home later that evening; Appellant was still parked outside her house. Kristine and Complainant exited their vehicle and Appellant walked over to them. Kristine and Appellant talked for about fifteen to thirty minutes. According to Kristine, Appellant was telling her that he "would be a better fit for [her] than [Complainant]." Kristine said Complainant would occasionally "cough" or "giggle" at something Appellant said but otherwise the

3

two men did not engage with each other.

Kristine said she felt like she was beginning to have a panic attack and told Appellant she was going inside her house. Kristine walked inside the house followed by Complainant. Complainant moved to close the front door but Appellant was standing closely behind him, preventing the door from closing.

Testifying at trial, Kristine and Appellant provided different accounts of the sequence of events that followed. According to Kristine, she saw Complainant push Appellant outside of the house, after which she "took a deep breath to kind of stabilize [her]self and started yelling at them to quit." Kristine estimated she was in the home "[n]ot even five seconds" before she too exited the front door.

Kristine said Appellant was leaning back on a bougainvillea bush after he had been pushed out of the house by Complainant. Kristine agreed that Appellant "somehow ends up kind of on the ground in the bushes with [Complainant] standing over him." Kristine denied that Complainant was standing in an "aggressive" position. Further describing Appellant's and Complainant's interactions, Kristine said the men at most were "[kind] of grabbing" each other, which she described as a "tussle." Kristine said the men were not punching each other. After the gunshot, Kristine said she saw Complainant "slumped" against Appellant. Appellant told Kristine "he attacked me" before walking away to his car.

According to Appellant, after the front door hit his foot Complainant grabbed the door, flung it open, and "immediately c[ame] out of the doorway very aggressively and shove[d] me a few feet backwards." Appellant recalled "stumbling backwards trying to catch [his] footing" while watching Complainant "aggressively approaching" with "his fists up like he's ready to throw a punch." Appellant said he tried to swing at Complainant but did not "land a punch at all."

4

Appellant said Complainant hit him with "multiple" punches.

Appellant testified that he fell to the ground with his left hand pinned behind his back. According to Appellant, Complainant got on top of him and "start[ed] strangling me immediately." Appellant said he started to lose his breath and could not breathe or talk. Appellant said he was in fear for his life and tried to push Complainant off but was unable to do so. Appellant said he used his left hand to reach his gun, which was located inside the waistband at the back of his pants. Appellant fired a single shot into Complainant's chest. When asked why he had a gun on his person, Appellant explained that he had a concealed handgun license and regularly carried a pistol in the back of his waistband.

After the shooting, Appellant said he was "in a panic" and "freaked out." Appellant walked to his car, where he changed his shirt and put the gun in the backseat. Appellant drove away from the scene and was traveling westbound on Highway 290 when he received a call from his father. According to Appellant, his father told him the police were at the house and that Appellant "need[ed] to come back home." Appellant returned to his parents' house, where he was arrested by police. Appellant's gun and the shirt he was wearing at the time of the shooting were recovered from his car's backseat.

The jury also heard testimony from Dr. Lopez, the medical examiner assigned to the case. Admitted into evidence during her testimony were photographs from Complainant's gunshot wound, showing that Complainant was shot in the middle of his upper chest. Pointing out the presence of soot on Complainant's chest, Dr. Lopez stated it was "the hallmark of a contact or close contact entrance wound." Continuing on, Dr. Lopez explained that "[i]t means that the gun was placed up to [Complainant's] chest, on his chest, when it was fired and discharged." Dr. Lopez said the bullet traveled "mostly front to back" and

5

"slightly left to right." Dr. Lopez agreed that, "for that trajectory to occur, the gun would have had to have been pointed in such a way as to cause the bullet to travel mostly straight."

Also admitted during Dr. Lopez's testimony were photographs of Appellant taken the night of the shooting. According to Dr. Lopez, the photographs appear to show "bruises around the neck" that "would indicate some kind of pressure or force being applied." Dr. Lopez also noted an "abrasion" on Appellant's back left shoulder.

The jury heard additional testimony from Sergeant Black, one of the officers who responded to the shooting. Reviewing pictures of Appellant taken shortly after the incident, Sergeant Black stated that there were "minor abrasions" on Appellant's face and neck "consistent with a minor physical altercation." Stating that he had "observed the evidence of many manual strangulations," Sergeant Black opined that Appellant's injuries were not consistent with strangulation and could "have been caused by a multitude of things." Sergeant Black also noted that Appellant's knuckles were "red and slightly abraded," which was "indicative of throwing a closed fist strike at somebody or striking somebody with the back of your hand."

After the close of evidence, the trial court instructed the jury on the law applicable to the case, including that governing Appellant's self-defense claim. The jury returned a verdict rejecting Appellant's self-defense claim and finding him guilty of murder. The jury assessed punishment at 23 years' confinement. Appellant timely appealed.

## ANALYSIS

Appellant raises the following five issues on appeal:

1. the trial court erred by refusing Appellant's requested jury instruction on the legal definition of "provocation";

2. the jury was improperly instructed on defense of a third person;

3. the jury charge failed to include the legal definitions of "criminal trespass," "harassment," and "stalking";

4. the State's closing argument was improper and inflamed the jury; and

5. the evidence was legally insufficient to support the jury's rejection of Appellant's self-defense claim.

We consider these issues below, beginning with Appellant's first three issues challenging the jury instructions.

## I.  Jury Instruction Issues

### A.  Standard of Review

"[T]he jury is the exclusive judge of the facts," but the trial court submits to the jury a charge "distinctly setting forth the law applicable to the case."  Tex. Code Crim. Proc. Ann. arts. 36.13, 36.14.  The charge is intended to inform the jury of the applicable law and how to apply that law to the facts of the case. *Alcoser v. State*, 663 S.W.3d 160, 164-65 (Tex. Crim. App. 2022).

In analyzing a jury charge issue, we first determine whether error exists in the charge.  *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015); *State v. Lausch*, 651 S.W.3d 546, 555 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd). If error exists, we proceed to analyze the harm resulting from the error to determine whether reversal is required.  *Price*, 457 S.W.3d at 440; *Lausch*, 651 S.W.3d at 555.

To analyze harm, we apply "separate standards of review depending on whether the defendant timely objected to the jury instructions." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016).  If the defendant timely objected, then reversal is required if we determine that the error caused the defendant "some

7

harm." *Id.* If the defendant did not timely object, then reversal is required only if the error was "so egregious and created such harm that the defendant did not have a fair and impartial trial." *Id.*

## B.    The Definition of "Provocation"

In his first issue, Appellant asserts the trial court erred by failing to include in the jury instructions the following definition of "provocation":

> On the issue of provocation, you are further instructed that the evidence must show that the act (if any) or the words (if any) of defendant were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon [Complainant].

The trial court's refusal of Appellant's requested provocation definition does not constitute error. The Court of Criminal Appeals previously has held that a charge on provocation is proper when:

> there is sufficient evidence (1) that the defendant did some act or used some words which provoked the attack on him, (2) that such act or words were reasonably calculated to provoke the attack, and (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting some harm upon the other.

*Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998) (en banc); *see also Zavala v. State*, 401 S.W.3d 171, 182-83 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Kennedy v. State*, No. 13-13-00416-CR, 2015 WL 3637917, at *7-9 (Tex. App.—Corpus Christi-Edinburg June 11, 2015, pet. ref'd) (mem. op., not designated for publication).

Appellant relies on *Smith*, *Kennedy*, and *Zavala* to support his argument on this point, but these cases held that a definition of provocation is necessary only in a specific context: when the jury also is instructed on "provoking the difficulty."

*See Smith*, 965 S.W.2d at 512-13; *Zavala*, 401 S.W.3d at 182-83; *Kennedy*, 2015 WL 3637917, at *8-9 & n.8; *see also* Tex. Penal Code Ann. § 9.31(b)(4) (delineating the elements for a "provoking the difficulty" finding in the context of self-defense). A "provoking the difficulty" finding bars a defendant's reliance on self-defense as a justification for his actions when the defendant "provoked the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(b)(4); *see also Pham v. State*, 595 S.W.3d 769, 779 (Tex. App.—Houston [14th Dist.] 2019), *aff'd*, 639 S.W.3d 708 (Tex. 2022) ("A defendant forfeits his right of self-defense if he provoked the attack so as to have a pretext for killing the complainant under the guise of self-defense.").

But here, the charge did not instruct the jury with respect to "provoking the difficulty." Specifically, the charge did not instruct the jury that it could not find Appellant acted in self-defense if it also found that Appellant provoked Complainant's use or attempted use of unlawful force. Although the charge did use the term "provoke" in other contexts, it did not use the term in conjunction with the specific instruction that requires the term's technical definition. *See* Tex. Penal Code Ann. § 9.31(b)(4); *see also Smith*, 965 S.W.2d at 512-13; *Zavala*, 401 S.W.3d at 182-83; *Kennedy*, 2015 WL 3637917, at *8-9 & n.8.

Therefore, the trial court did not err in refusing Appellant's requested instruction on the definition of "provocation." We overrule Appellant's first issue.

### C. Defense of a Third Person Instruction

In his second issue, Appellant asserts the jury was improperly instructed on defense of a third person as follows:

A person is justified in using force or deadly force against another to protect a third person if:

(1) under the circumstances as the actor reasonably believes them to

9

be, the actor would be justified in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

(2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

According to Appellant, this instruction was submitted to the jury based on evidence relevant to **Complainant's** point of view at the time of the incident, *i.e.*, that Complainant was acting to deflect a threat towards Kristine. Appellant argues that, because the law of self-defense "focuses on the point of view of the accused and not the point of view or actions of the decedent," the trial court erred in instructing the jury on the defense of third person.

Bound by precedent from the Court of Criminal Appeals, we conclude that the trial court's inclusion of the defense of third person instruction did not constitute error. *See Bennett v. State*, 726 S.W.2d 32 (Tex. Crim. App. 1986) (en banc).

At issue in *Bennett* was whether the appellant was acting in self-defense when he fatally shot a third person who also wielded a gun in response to appellant placing a gun in the face of a young man who was dating the appellant's daughter. *Id*. at 34-35. The deceased was a family friend of the young man and, during the encounter, twice insisted that appellant take the gun out of the young man's face. *Id*. The appellant turned the gun toward the deceased and fired, killing him. *Id*. The trial court proceeded to give, over the appellant's objection, the following instruction:

A person is justified in using deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under the preceding sections of this charge dealing with the law of self-defense in using deadly force to protect himself against unlawful deadly force which he

10

reasonably believes to be threatening the third person he seeks to protect; and (2) the actor further reasonably believes that his intervention is immediately necessary to protect the third person.

Holding that the instruction was proper, the Court of Criminal Appeals rejected the intermediate court of appeals' conclusion that the charge improperly raised the lawfulness of actions undertaken by the complainant in a criminal action against the appellant. *See id.* at 36. According to the court, "[w]here the evidence raises some question whether the deceased's conduct was justified, as it did in this cause, the deceased becomes 'a person whose criminal responsibility is in issue' in the case." *Id.* The Court of Criminal Appeals reasoned that, to fully evaluate the appellant's self-defense claim, "the jury necessarily had to evaluate the reasonableness of [the deceased's] belief that appellant was using or attempting to use deadly force against [the young man], and that the force [the deceased] used to repel appellant's attack against [the young man] was immediately necessary." *Id.* at 38. However, the jury ultimately was required to determine "whether appellant, viewed strictly from his standpoint, reasonably believed that [the deceased] was acting lawfully," thus keeping the jury focused on the overarching inquiry central to appellant's self-defense claim.[1] *Id.*

As in *Bennett*, the jury here was instructed on defense of third person based on evidence relevant to Complainant's point of view at the time of the shooting.

---

[1] We note that, since *Bennett* was decided in 1986, the Court of Criminal Appeals has appeared to suggest that the issue of self-defense focuses **only** on the defendant. *See Rogers v. State*, 664 S.W.3d 843, 853 (Tex. Crim. App. 2022), *withdrawn on other grounds*, 677 S.W.3d 705 (Tex. Crim. App. 2023) (per curiam). In *Rogers*, the Court of Criminal Appeals addressed whether the trial court erred when it denied the defendant's request for a jury instruction on self-defense. 664 S.W.3d at 851-55. The State argued on appeal that refusing the instruction was not error because the complainant initially used lawful force in self-defense against the defendant. *See id.* at 853 (citing Tex. Penal Code Ann. §§ 9.31-.32). Rejecting this argument, the Court emphasized that the Penal Code provisions addressing self-defense focus only on the "actor" and "remain[] silent on the actions and reasonable beliefs of the 'other.'" *Id.*

11

The jury also was instructed that its ultimate self-defense determination was to be made "viewed from the standpoint of the defendant" at the time of the incident. Therefore, guided by the Court of Criminal Appeals' decision in *Bennett*, we conclude the trial court did not err in instructing the jury on defense of a third person. We overrule Appellant's second issue.

### D. Definitions of "Criminal Trespass," "Harassment," and "Stalking"

In his third issue, Appellant asserts the trial court erred by failing to include in the jury charge definitions of "criminal trespass," "harassment," and "stalking."

Appellant did not request an instruction on these terms' definitions; rather, the terms first were mentioned during the State's closing argument. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc). Discussing the presumption in favor of finding that deadly force was reasonably necessary, the State argued:

> It also talks about whether you can presume the defendant's actions or anyone's actions to be reasonable in thinking that deadly force was immediately necessary.[2] So, it says presumed to be reasonable that

---

[2] Specifically, this portion of the jury instructions states as follows:

The actor's belief that deadly force is immediately necessary is presumed to be reasonable if the actor:

(1) knew or had reason to believe that the person against whom the deadly force was used:

    (a) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's habitation, vehicle, or place of business or employment;

    (b) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

    (c) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

deadly force was immediately necessary if the actor knew or had reason to believe that the person against whom the deadly force was used was trying to break into the house essentially or trying to commit a felony like sexual assault, murder, did not provoke the other person and was not otherwise engaged in criminal activity. So, if you don't think — if you think one of those applies, then his deadly force is not presumed to be reasonable. ***So, if you think that the defendant was engaged in criminal activity, AKA trespassing or harassment or stalking, then his force — his deadly force is not presumed to be reasonable***.

(emphasis added); *see also* Tex. Penal Code Ann. § 9.31(a) (discussing the factors that must be present to presume a defendant's use of force was reasonable, including that the defendant "was not otherwise engaged in criminal activity").

During this portion of the State's closing argument, Appellant did not object to the State's use of the terms "trespassing," "harassment," or "stalking." On appeal, Appellant contends that the trial court had a *sua sponte* duty to instruct the jury on these terms' particular technical legal meanings.

Appellant does not cite any cases to support the application of a *sua sponte* duty to supply an instruction in these circumstances. "Criminal activity" as it is used in Chapter 9 of the Texas Penal Code is undefined, and courts have given effect to its plain meaning as the best indicator of legislative intent. *See, e.g.*, *Barrios v. State*, 389 S.W.3d 382, 393 (Tex. App.—Texarkana 2012, pet. ref'd); *Johnson v. State*, No. 01-15-00101-CR, 2016 WL 4536954, at *13 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, pet. ref'd) (mem. op., not designated for publication). "Thus, criminal activity can be broadly construed to comport with the generally understood concept that it would encompass any activity that

---

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

13

constitutes a crime." *Barrios*, 389 S.W.3d at 393; *see also Johnson*, 2016 WL 4536954, at *13.

In light of the broad definition of "criminal activity," we conclude the trial court did not err in failing to *sua sponte* instruct the jury as to the specific definitions of "criminal trespass," "harassment," or "stalking" when those terms were mentioned in the State's closing argument. *See Barrios*, 389 S.W.3d at 393; *see also Johnson*, 2016 WL 4536954, at *13. We overrule Appellant's third issue.

## II. The State's Closing Argument

In his fourth issue, Appellant asserts the State's closing argument "was improper and inflamed the jury" and points to the following statements:

> And today [Appellant] feels entitled for you to let him walk free like he's been walking free for the last six and a half years. You know, [Complainant's] family can't pay $5,000 to bail him out of the grave.

Appellant's counsel objected to these statements during closing argument and stated: "Judge, this is improper argument. No testimony on that." The trial court overruled Appellant's objection.

We review a trial court's ruling on a jury argument objection for an abuse of discretion. *Gonzalez v. State*, 541 S.W.3d 306, 315 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Proper jury argument generally is limited to four areas: (1) summation of the evidence presented at trial; (2) reasonable deductions and inferences from the evidence; (3) responses to opposing counsel's argument; and (4) appropriate pleas for law enforcement. *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). Counsel's remarks during closing argument must be considered in the context in which they were made. *Denison v. State*, 651 S.W.2d 754, 761 (Tex. Crim. App. 1983) (en banc).

Courts have held that references similar to "walking free" may be construed

14

as proper pleas for law enforcement. *See, e.g.*, *Harrell v. State*, No. 01-95-00752-CR, 1997 WL 230145, at *7 (Tex. App.—Houston [1st Dist.] May 8, 1997, pet. ref'd) (not designated for publication) (the prosecutor stated in his closing argument that appellant should not be able to "walk scott free"); *Sears v. State*, No. A14-91-00301-CR, 1992 WL 105802, at *6 (Tex. App.—Houston [14th Dist.] May 21, 1992, pet. ref'd) (not designated for publication) (the prosecutor stated, "[i]f you're going to let [the defendant] ride out of here, get prepared to deal with him again in the future"); *Faggett v. State*, No. B14-86-179-CR, 1987 WL 15050, at *2 (Tex. App.—Houston [14th Dist.] July 30, 1987, no pet.) (not designated for publication) (the prosecutor stated, "[i]f the defendant gets off with an assault or not guilty, there is going to be a free reign on [prison] guards because this defendant is going to think he's got away from something").

Similarly, courts also have held that statements regarding a family's inability to spend time with a deceased complainant are not outside the bounds of a permissible closing argument. *See, e.g.*, *Carter v. State*, 614 S.W.2d 821, 822-23 (Tex. Crim. App. 1981) (prosecutor's argument that murder victim's mother did not get to spend Christmas with victim permissible); *Thompson v. State*, No. 01-95-01465-CR, 1997 WL 109960, at *1 (Tex. App.—Houston [1st Dist.] Mar. 13, 1997, no pet.) (not designated for publication) (the prosecutor stated, "[t]his is a horrible, horrible tragedy that [complainant's] family is facing, has faced since Mother's Day").

Moreover, testimony discussing Appellant's bail came into evidence at trial with no objection from Appellant. *See Milton*, 572 S.W.3d at 239 (proper jury argument generally includes evidence presented at trial). In Kristine's recorded interview with Sergeant Black taken shortly after the incident, Sergeant Black told Kristine that the typical Harris County murder bond at the time was $50,000,

15

which defendants could obtain by paying $5,000.

For these reasons, we conclude the trial court did not abuse its discretion in overruling Appellant's objection to the challenged statements in the State's closing argument. We overrule Appellant's fourth issue.

## III. Sufficiency of the Evidence

In his fifth issue, Appellant asserts the evidence is legally insufficient to rebut the presumption that his use of deadly force was reasonable given Complainant's initial application of lethal force against Appellant. According to Appellant, "[u]ncontroverted evidence indicated that [Complainant] was strangling [Appellant] when [Complainant] was shot."

When reviewing the legal sufficiency of the evidence supporting a conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We presume that the jury resolved conflicting inferences in favor of the verdict and defer to its determination of evidentiary weight and witness credibility. *See Braughton v. State*, 569 S.W.3d 592, 607-08 (Tex. Crim. App. 2018). We consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016).

Appellant's argument overstates the strength of the evidence in his favor. Contrary to Appellant's assertion, the record does not contain "uncontroverted" evidence indicating that Complainant was strangling Appellant when Complainant

16

was shot.

Although Appellant's testimony supports this interpretation, Kristine testified to a markedly different version of events. According to Kristine, she saw Complainant push Appellant outside of her home and followed the men outside after pausing briefly to catch her breath. Kristine recalled that Appellant was leaning back on a bougainvillea bush before he "end[ed] up kind of on the ground" with Complainant "standing over him." Kristine denied that Complainant was standing in an "aggressive" position. Further describing Appellant's and Complainant's interactions, Kristine said the men at most were "[kind] of grabbing" each other, which she described as a "tussle." Kristine said the men were not punching each other in the moments before Appellant shot Complainant.

The jury also heard testimony from Sergeant Black, who opined that Appellant's injuries were not indicative of strangulation but rather were "minor abrasions" that were "consistent with a minor physical altercation."

Considering this evidence in the light most favorable to the verdict, the jury reasonably could have concluded that Complainant did not apply lethal force against Appellant prior to the shooting. *See Hooper*, 214 S.W.3d at 13. Therefore, we overrule Appellant's fifth issue.

## CONCLUSION

Having overruled Appellant's issues, we affirm the trial court's judgment.

17

/s/     Meagan Hassan
        Justice


Panel consists of Justices Wise, Spain, and Hassan.

Do Not Publish — Tex. R. App. P. 47.2(b).